# EXHIBIT B

Unassociated Document

8-K 1 v198752_8k.htm

## SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C. 20549

### FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act 1934

Date of Report (Date of earliest event reported):  October 11, 2010

Harbin Electric, Inc.
(Exact name of registrant as specified in charter)

Nevada
(State or other jurisdiction of incorporation)

| | |
|---|---|
| 000-51006 | 98-0403396 |
| (Commission File Number) | (IRS Employer Identification No.) |

No, 9, Ha Ping Xi Lu, Ha Ping Lu Ji Zhong Qu
Harbin Kai Fa Qu, Harbin, China
(Address of principal executive offices)

150060

(Zip Code)

Registrant's telephone number, including area code:

86-451-86116757

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12(b) under the Exchange Act (17 CFR 240.14a-12(b))

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Unassociated Document

### Item 8.01  Other Events.

On October 11, 2010, Harbin Electric, Inc. (the "Company") issued a press release announcing that its Board of Directors has received a proposal letter from its Chairman and Chief Executive Officer of the Company, Mr. Tianfu Yang ("Mr. Yang") and Baring Private Equity Asia Group Limited ("Baring") for Mr. Yang and an investment fund advised by Baring (the "Baring Fund") to acquire all of the outstanding shares of common stock, par value $0.00001 per share ("Common Stock") of the Company not currently owned by Mr. Yang and his affiliates in a going private transaction for $24.00 per share in cash, subject to certain conditions. Mr. Yang owns 31.1% of the Company's Common Stock. According to the proposal letter, an acquisition vehicle for the purpose of completing the acquisition will be formed and the acquisition is intended to be financed with a combination of debt and equity capital. The proposal letter states that the equity portion of the financing would be provided by Mr. Yang, the Baring Fund and related sources. The proposal letter also states that Goldman Sachs (Asia) LLC ("Goldman") is acting as financial advisor to the acquisition vehicle to be formed by Mr. Yang and the Baring Fund.

The Company's Board of Directors has formed a special committee of independent directors consisting of David Gatton, Boyd Plowman and Ching Chuen Chan (the "Special Committee") to consider this proposal. The Special Committee intends to retain independent advisors, including an independent financial advisor, to assist it in its work. No decisions have been made by the Special Committee with respect to the Company's response to the proposal. There can be no assurance that any definitive offer will be made, that any agreement will be executed or that this or any other transaction will be approved or consummated. A copy of the press release is filed herewith as Exhibit 99.1 to this current report on Form 8-K and is incorporated herein by reference.

### Item 9.01.  Financial Statements and Exhibits

Exhibits

99.1      Press Release dated October 11, 2010.

Unassociated Document

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

HARBIN ELECTRIC, INC.

By:   /s/ Tianfu Yang
Name: Tianfu Yang
Title:  Chairman and Chief Executive Officer

Dated: October 12, 2010

Unassociated Document

EX-99.1 2 v198752_ex99-1.htm

Exhibit 99.1

**Harbin Electric, Inc. Announces Receipt of 'Going Private' Proposal at $24.00 Per Share**

ꝗꝗ
PRNewswire
Companies: Harbin Electric, Inc.
Topics: Industrial Goods

Press Release Source: Harbin Electric, Inc. On Monday October 11, 2010, 7:00 am EDT

HARBIN, China, Oct. 11 /PRNewswire-Asia-FirstCall/ -- Harbin Electric, Inc. ("Harbin" or the "Company") (Nasdaq:HRBN - News), a leading developer and manufacturer of a wide array of electric motors in the People's Republic of China, today announced that its Board of Directors has received a proposal letter from its Chairman and Chief Executive Officer, Mr. Tianfu Yang ("Mr. Yang") and Baring Private Equity Asia Group Limited ("Baring") for Mr. Yang and an investment fund advised by Baring (the "Baring Fund") to acquire all of the outstanding shares of Common Stock of Harbin not currently owned by Mr. Yang and his affiliates in a going private transaction for $24.00 per share in cash, subject to certain conditions. Mr. Yang owns 31.1% of Harbin's Common Stock. According to the proposal letter, an acquisition vehicle for the purpose of completing the acquisition will be formed and the acquisition is intended to be financed with a combination of debt and equity capital. The proposal letter states that the equity portion of the financing would be provided by Mr. Yang, the Baring Fund and related sources. The proposal letter also states that Goldman Sachs (Asia) LLC ("Goldman") is acting as financial advisor to the acquisition vehicle to be formed by Mr. Yang and the Baring Fund.

Harbin's Board of Directors has formed a special committee of independent directors consisting of David Gatton, Boyd Plowman and Ching Chuen Chan (the "Special Committee") to consider this proposal. The Special Committee intends to retain independent advisors, including an independent financial advisor, to assist it in its work. No decisions have been made by the Special Committee with respect to Harbin's response to the proposal. There can be no assurance that any definitive offer will be made, that any agreement will be executed or that this or any other transaction will be approved or consummated.

About Harbin Electric, Inc.

Harbin Electric, headquartered in Harbin, China, is a leading developer and manufacturer of a wide array of electric motors with a focus on innovative, customized, and value-added products. Its major product lines include industrial rotary motors, linear motors, and specialty micro-motors. The Company's products are purchased by a broad range of domestic and international customers, including those involved in the energy industry, factory automation, food processing, packaging, transportation, automobile, medical devices, machinery and tool manufacturing, chemical, petrochemical, as well as in the metallurgical and mining industries. The Company operates four manufacturing facilities in China located in Xi'an, Weihai, Harbin, and Shanghai.

Harbin Electric has built a strong research and development capability by recruiting talent worldwide and through collaborations with top scientific institutions. The Company owns numerous patents in China and has developed award-winning products for its customers. Relying on its own proprietary technology, the Company developed an energy efficient linear motor driven oil pump, the first of its kind in the world, for the largest oil filed in China. Its self-developed linear motor propulsion system is powering China's first domestically made linear motor driven metro train. As China continues to grow its industrial base, Harbin Electric aspires to be a leader in the industrialization and technology transformation of the Chinese manufacturing sector. To learn more about Harbin Electric, visit www.harbinelectric.com.

Unassociated Document

For investor and media inquiries, please contact:

Christy Shue
Harbin Electric, Inc.
Executive VP, Finance & Investor Relations
Tel: +1-631-312-8612
Email: IR@HarbinElectric.com

Kathy Li
Christensen Investor Relations
Tel: +1-212-618-1978
Email: kli@christensenir.com

# EXHIBIT C

Unassociated Document

8-K 1 y200626_8k.htm

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of

the Securities Exchange Act 1934

Date of Report (Date of earliest event reported):  October 29, 2010

Harbin Electric, Inc.
(Exact name of registrant as specified in charter)

Nevada
(State or other jurisdiction of incorporation)

| 000-51006 | | 98-0403396 |
|---|---|---|
| (Commission File Number) | | (IRS Employer Identification No.) |
| No. 9, Ha Ping Xi Lu, Ha Ping Lu Ji Zhong Qu Harbin Kai Fa Qu, Harbin, China | | 150060 |
| (Address of principal executive offices) | | (Zip Code) |
| Registrant's telephone number, including area code: | | 86-451-86116757 |
| | (Former name or former address, if changed since last report) | |

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12(b) under the Exchange Act (17 CFR 240.14a-12(b))

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Unassociated Document

Item 8.01   Other Events.

On October 29, 2010, Harbin Electric, Inc. (the "Company") issued a press release announcing that the Special Committee of its Board of Directors that was previously formed to consider and evaluate among other things, a proposal by a group headed by the Company's Chairman and Chief Executive Officer, Mr. Tianfu Yang to take the Company private, has retained Morgan Stanley & Co. Incorporated as its financial advisor and Gibson Dunn & Crutcher LLP, as its legal counsel to assist it in its work.

A copy of the press release is filed herewith as Exhibit 99.1 to this current report on Form 8-K and is incorporated herein by reference.

Item 9.01.   Financial Statements and Exhibits

Exhibits

99.1        Press Release dated October 29, 2010.

Unassociated Document

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

HARBIN ELECTRIC, INC.

By:/s/ Tianfu Yang
_____

Name:  Tianfu Yang
Title:   Chairman and Chief Executive
Officer

Dated: November 2, 2010

# EXHIBIT D

1  THE O'MARA LAW FIRM, P.C.
   WILLIAM M. O'MARA (Nevada Bar No. 837)
2  DAVID C. O'MARA (Nevada Bar No. 8599)
   311 East Liberty Street
3  Reno, NV 89501
   Telephone: 775/323-1321
4  775/323-4082 (fax)                                    C. COOPER

5  Attorneys for Plaintiff

6  [Additional counsel appear on signature page.]

7              IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

8                          IN AND FOR CARSON CITY

9

10  KAY HUREWITZ, Individually and on Behalf )   Case No.
    of All Others Similarly Situated,        )   Dept No.
11                                           )
                      Plaintiff,             )   CLASS ACTION
12                                           )
         vs.                                 )   COMPLAINT BASED UPON BREACH OF
13                                           )   FIDUCIARY DUTIES
    HARBIN ELECTRIC, INC., TIANFU YANG,      )
14  CHING CHUEN CHAN, BOYD PLOWMAN,          )
    DAVID GATTON, YUNYUE YE and              )
15  LANXIANG GAO,                            )
                                             )
16                    Defendants.            )
                                             )
17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff, by her attorneys, submits this complaint against the defendants named herein and alleges as follows:

## SUMMARY OF THE ACTION

1.     This is a stockholder class action brought by plaintiff on behalf of the holders of Harbin Electric, Inc. ("Harbin" or the "Company") common stock against Harbin and its Board of Directors arising out of their efforts to complete a management-led buyout of Harbin via an unfair process at a grossly inadequate and unfair price of $24 per share (the "Buyout"). The individuals seeking to purchase the Company include Tianfu Yang ("Yang"), the Company's Chairman and Chief Executive Officer, Hero Wave Investments Limited ("Hero"), a company affiliated with Yang that, collectively with Yang, controls over 30% of the Company's common stock, and Baring Private Equity Asia Group Limited, the largest regional growth equity firm in Asia (collectively referred to as the "Buyout Group").

2.     In pursuing the unlawful plan to squeeze out Harbin's public stockholders for grossly inadequate consideration, and without a fair process, including full and fair disclosure of all material information, the defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided and abetted such breaches by Harbin officers and directors. Instead of attempting to obtain the highest price reasonably available for the Company's stockholders, defendants are spending a substantial effort to tailor the Buyout to meet the specific needs of the Buyout Group.

3.     Because defendants dominate and control the business and corporate affairs of Harbin and are in possession of private corporate information concerning Harbin assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Harbin, which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

4.     In short, the Buyout is designed to unlawfully divest Harbin's public stockholders of a large portion of the valuable assets of the Company for grossly inadequate consideration. Defendants know that the Company possesses numerous assets that will continue to produce

- 1 -

1 substantial revenue and earnings, which defendants wish to keep for themselves. Although the

2 Company has formed a so-called Special Committee to evaluate the Buyout, the Buyout is

3 essentially a *fait accompli* because the Special Committee is acting to appease the Buyout Group,

4 which has no interest in a fair evaluation of the Buyout. Accordingly, plaintiff seeks to enjoin the

5 Buyout.

JURISDICTION AND VENUE

6

7     5.    This Court has jurisdiction over each defendant named herein because each defendant

8 is either a corporation that conducts business in and maintains operations in this County, or is an

9 individual who has sufficient minimum contacts with Nevada so as to render the exercise of

10 jurisdiction by the Nevada courts permissible under traditional notions of fair play and substantial

11 justice.

12     6.    Venue is proper in this Court because Harbin is incorporated in Nevada and

13 defendants include officers and/or directors of a Nevada corporation.

PARTIES

14

15     7.    Plaintiff Kay Hurewitz is, and at all times relevant hereto was, a shareholder of

16 Harbin.

17     8.    Defendant Harbin is a holding company incorporated in Nevada. Through its U.S. and

18 China-based subsidiaries, it designs, develops, manufactures, supplies, and services a wide range of

19 electric motors, including linear motors, specialty micro-motors, and industrial rotary motors, with a

20 focus on innovation, creativity, and value-added products.

21     9.    Defendant Yang is and at all relevant times has been the Chairman and Chief

22 Executive Officer of Harbin. Yang beneficially owns 31.11% of the Company's common stock.

23     10.    Defendants Ching Chuen Chan, Boyd Plowman, David Gatton, Yunyue Ye, and

24 Lanxiang Gao are, and at all relevant times have been, members of Harbin's Board of Directors.

25     11.    The defendants named above in ¶¶9-10 are collectively referred to herein as the

26 "Individual Defendants."

DEFENDANTS' FIDUCIARY DUTIES

27

28     12.    Where the directors of a publicly traded corporation undertake a transaction that will

- 2 -

result in either: (i) a change in corporate control; or (ii) a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

     (a)   adversely affects the value provided to the corporation's shareholders;

     (b)   will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

     (c)   contractually prohibits themselves from complying with their fiduciary duties;

     (d)   will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

     (e)   will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

13.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Harbin, are obligated under Nevada law to refrain from:

     (a)   participating in any transaction where the directors' or officers' loyalties are divided;

     (b)   participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

     (c)   unjustly enriching themselves at the expense or to the detriment of the public shareholders.

14.    Plaintiff alleges herein that defendants, separately and together, in connection with the Buyout, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed to plaintiff and other public shareholders of Harbin. Defendants stand on both sides of the transaction, are engaging in self dealing, are obtaining for themselves personal benefits, including personal financial benefits, not shared equally by plaintiff or the Class, and are choosing not to provide shareholders with all information necessary to make an

1  informed decision in connection with the Buyout and/or are aiding and abetting other defendants'

2  breaches. As a result of defendants' self dealing and divided loyalties, neither plaintiff nor the Class

3  are being treated fairly in connection with the proposed Buyout.

4       15.  Defendants also owe the Company's stockholders a duty of truthfulness under

5  Nevada law, which includes the disclosure of all material facts concerning the Buyout and,

6  particularly, the fairness of the price offered for the stockholders' equity interest. Defendants are

7  knowingly or recklessly breaching their fiduciary duties of candor and good faith by failing to

8  disclose all material information concerning the Buyout, and/or aiding and abetting other defendants'

9  breaches.

10       16.  Defendants are knowingly or recklessly breaching their duties of loyalty, good faith,

11  independence and candor in connection with the Buyout, and/or aiding and abetting other

12  defendants' breaches, and have the burden of proving the inherent or entire fairness of the Buyout,

13  including all aspects of its negotiation, structure, price and terms.

14  **BACKGROUND**

15       17.  Harbin is a holding company incorporated in Nevada. Through its U.S. and China-

16  based subsidiaries, it designs, develops, manufactures, supplies, and services a wide range of electric

17  motors, including linear motors, specialty micro-motors, and industrial rotary motors, with a focus

18  on innovation, creativity, and value-added products.

19       18.  Harbin has recently reported excellent financial results and has tremendous prospects.

20  For example, in an August 9, 2010, press release entitled "Harbin Electric Reports Significantly

21  Higher Second-Quarter Earnings," the Company stated:

22      Harbin Electric, Inc. ("Harbin Electric" or the "Company"), a leading developer and
    manufacturer of a wide array of electric motors in the People's Republic of China.

23      today reported its financial results for the second quarter of 2010.

24      Financial Highlights

25      -- Total revenues were $105.44 million, up 175% from $38.36 million in 2Q09

26      -- Operating income totaled $28.08 million, up 219% from $8.82 million in 2Q09

27      -- Adjusted net income attributable to controlling interest was $24.02 million, up
    224% compared to $7.42 million in 2Q09

28

-- GAAP earnings per diluted share attributable to controlling interest were $0.82, compared to a net loss of $0.24 in 2Q09

-- Adjusted earnings per diluted share attributable to controlling interest were $0.77 per diluted share, compared to $0.33 in 2Q09

*    *    *

"We are very pleased with our outstanding second quarter earnings," said Mr. Yang, Chairman and Chief Executive Officer of Harbin Electric. "Adjusted net income, by which we judge our management performance, was up 224% year-over-year at $24.02 million. We have made remarkable progress in the restructuring and integration of Xi'an Tech Full Simo Motor, which has led to a significant improvement in our operating efficiency. During this quarter, we restructured its subsidiaries, acquiring full ownership in four partially owned subsidiaries and disposing of non-strategic businesses. This brings us enhanced synergies across our diversified product lines and strengthens profit margins and earnings power. While our top line benefited from the acquisition of Xi'an Tech Full Simo Motor, earlier strategic moves continued to add to revenues. Weihai revenues were up 39% and oil pumps and coal transportation project performed strongly."

Revenues

For the second quarter of 2010, total revenues were $105.44 million, up 175% compared with $38.36 million in the second quarter of 2009, which was negatively impacted by the global financial crisis. The significant sales growth was mainly the result of higher sales across all product lines and a contribution of $44.57 million from Xi'an Tech Full Simo which was acquired in October 2009. Excluding the acquisition, organic growth was 59% year over year.

By product line, linear motor sales were up 76% driven by higher oil pump sales (150 units in the second quarter of 2010 compared to 105 units in the second quarter of 2009) and revenues from coal transportation project ($5.31 million), which started to contribute in the fourth quarter of 2009. Sales of specialty micro motors were up 77% from the second quarter of 2009. Sales of industrial rotary motors increased from $17.00 million to $68.12 million including $44.57 million from Xi'an Tech Full Simo. Sales of rotary motors at Weihai Tech Full Simo totaled $23.56 million for the quarter, up 39% compared with $17 million in the second quarter of 2009.

International sales totaled $5.60 million, or 5.3% of total sales, for the quarter, an increase of 56% compared with $3.58 million in the second quarter of 2009, when the global economic downturn hit our international business severely. The international sales growth was driven primarily by increased sales in our specialty micro motor and rotary motor products.

*    *    *

Operating Income

Operating income in the second quarter of 2010 totaled $28.08 million, compared with $8.82 million in the second quarter of 2009, representing a 219% year over year growth. Higher operating income was mainly due to increased sales, the acquisition of Xi'an Tech Full Simo, and improved operating efficiency. Total operating costs including selling, general and administrative ("SG&A") expenses and

research & development (R&D) expenses totaled $7.25 million, compared with $4.05 million a year ago. The higher operating costs were mainly due to the addition of Xi'an Tech Full Simo, higher expenses related to higher sales such as shipping and handling costs, higher depreciation expense, and higher costs associated with the production start-up at our Shanghai facility. As a percentage of total sales, total operating costs decreased from 10.6% to 6.9%. Operating margin improved to 26.6% in the current quarter from 23.0% in the second quarter of 2009, reflecting a significant improvement in operating efficiency as a result of business integration and consolidation.

*     *     *

Outlook

"Despite concerns about the slowing down of the Chinese economy, we continue to see strong demand for many of our products. As we expect continued strong order volume for our rotary motors, our focus in the months ahead is to address production capacity constraints at our Weihai and Xi'an facilities. In our specialty motor lines including linear motors and specialty micro-motors, where speed of product development and market launch is the key to future growth, we have made substantial capital investments. We believe that capacity expansion and the expected and long-awaited launch of new products, coupled with our success in business integration, restructuring, and consolidation, will help us further extend our leadership position in the industry. "

19.     These tremendous results came on the heels of earlier excellent results.  As the Company stated in a May 10, 2010, press release entitled "Harbin Electric Delivers Record Quarterly Earnings":

Harbin Electric, Inc. ("Harbin Electric" or the "Company"), a leading developer and manufacturer of a wide array of electric motors in the People's Republic of China, today reported its financial results for the first quarter of 2010.

Financial Highlights

·· Total revenues were $105.49 million, up 243% from $30.72 million in 1Q09

·· Operating income totaled $27.73 million, up 246% from $8.03 million in 1Q09

·· Adjusted net income attributable to controlling interest (excluding non-cash item due to change in fair value of warrant) was $20.79 million, up 242% from $6.08 million in 1Q09

·· GAAP earnings attributable to controlling interest were $0.66 per diluted share, compared with $0.39 in 1Q09

·· Adjusted earnings attributable to controlling interest (excluding non-cash item due to change in fair value of warrant) were $0.66 per diluted share, compared with $0.27 in 1Q09

*     *     *

Revenues

In the first quarter of 2010, total sales more than tripled to $105.49 million compared to $30.72 million in 1Q09, which was negatively impacted by the global financial crisis. The acquisition of Xi'an Tech Full Simo Electric Motor Co. Ltd. ("Xi'an Simo") in October 2009 contributed $45.03 million. Excluding this acquisition, sales increased by 97% year over year. The higher sales were primarily driven by increased sales in all product lines resulting from strong economic recovery in China.

By product line, linear motor sales were up 60% driven by higher oil pumps sales (105 units in 1Q10 compared to 30 units in 1Q09) and sales from our linear motor propulsion systems developed for coal transportation trains ($5.5 million), which started to contribute in the fourth quarter of 2009. Sales of specialty micro motors were up 165% from 1Q09. Sales of industrial rotary motors increased from $10.8 million to $67.5 million including $45.03 million from Xi'an Simo. Sales of rotary motors at our Weihai facility more than doubled.

International sales totaled $7.06 million, up 117% compared with $3.26 million in 1Q09, when the global economic downturn hit our international business severely. The international sales growth was driven by increased sales in our specialty micro motor and rotary motor products.

＊　　　＊　　　＊

Net Income

Net income attributable to controlling interest in the quarter totaled $20.55 million ($0.66 per diluted share), up 137% from $8.65 million ($0.39 per diluted share) in 1Q09. Excluding non-cash charges due to the change in fair value of warrants related to the debt issued in 2006, adjusted net income attributable to controlling interest in the quarter totaled $20.79 million ($0.66 per diluted share), compared with $6.08 million ($0.27 per diluted share) a year ago. The higher net income was primarily driven by higher sales across all product lines, contributions from the acquisition of Xi'an Simo, and higher other income ($1.12 million in 1Q10 versus $0.54 million in 1Q09).

＊　　　＊　　　＊

Operating Income

Operating income totaled $27.73 million, compared with $8.03 million in 1Q09, representing a 246% year over year growth. Higher operating income was mainly due to increased sales and the acquisition of Xi'an Simo. Total operating costs including selling, general and administrative ("SG&A") expenses and research & development (R&D) expenses totaled $8.01 million, compared with $2.90 million a year ago. The higher operating costs were mainly due to the addition of Xi'an Simo, higher expenses related to higher sales such as shipping and handling costs, higher depreciation expense, and higher costs associated with the production start-up at our Shanghai facility. As a percentage of total sales, the Company's total operating costs decreased from 9.4% to 7.6%. Operating margin was relatively stable at 26.3% and 26.1% in 1Q10 and 1Q09, respectively.

"Despite a long Chinese new-year holiday, we maintained the momentum from the fourth quarter 2009 and delivered another set of strong results, thanks to the

hard work of our employees even during the traditional holiday season. While we are quite pleased to see the significant impact of our recent acquisition on all our revenues and profits, we are very satisfied with the progress made across all our existing business lines and in our international sales," said Mr. Yang, Chairman and Chief Executive Officer of Harbin Electric.

Outlook

"We believe that our business diversification efforts are paying off. We exited the quarter seeing continued strength in demand, setting us up nicely for the seasonally stronger second quarter. We are also encouraged by signs of stronger global economic activity, particularly in our North American market," commented Mr. Yang.

"We understand that some of our investors are concerned that the recent Chinese government efforts to cool down the real estate market and combat inflation might impact our business negatively. However, we believe that our business is a key foundation of China's overall economic growth and supports a wide range of economic sectors from agriculture to industry and manufacturing. Thanks to our diversification strategy, we do not expect a slowdown in the real estate sector in China to negatively impact our business. We continue to be very focused on restructuring our newly acquired Xi'an Simo business and improving manufacturing efficiency in Weihai. Our first quarter results reflect some early achievements in a very short period of time. We expect to expand on these positive results in the coming quarters."

20.    These results in turn came on the heels of record 4Q09 and FY09 results, as the Company disclosed in a March 10, 2010, press release entitled "Harbin Electric Reports Record Fourth Quarter and Full Year 2009 Results":

Harbin Electric, Inc. ("Harbin Electric" or the "Company"), a leading developer and manufacturer of a wide array of electric motors in the People's Republic of China, today reported its preliminary full-year and fourth quarter 2009 financial results. The Company will release fully audited financials in its 10K filing in the coming days and does not expect any material changes.

Fourth Quarter 2009 Financial Highlights

-- Total revenues were $107.2 million, up 209% from $34.7 million in 4Q08

-- Adjusted net income attributable to controlling interest (excluding non-recurring items) was $19.4 million, up 220% from $6.0 million in 4Q08

-- GAAP earnings attributable to controlling interest were $0.59 per diluted share, compared with $0.27 in 4Q08

-- Adjusted earnings attributable to controlling interest (excluding non-recurring items) were $0.62 per diluted share

Fiscal Year 2009 Financial Highlights

-- Total revenues were $223.2 million, up 85% from $120.8 million in 2008

-- Adjusted net income attributable to controlling interest (excluding non-recurring items) was $43.8 million, up 73% from $25.4 million in 2008

-- GAAP earnings attributable to controlling interest were $0.77 per diluted share, compared with $1.19 in 2008

-- Adjusted earnings attributable to controlling interest (excluding non-recurring items) were $1.71 per diluted share

\*          \*          \*

In the fourth quarter of 2009, total sales more than tripled to $107.2 million compared to $34.7 million in 4Q08, which was negatively impacted by the global financial crisis. The acquisition of Xi'an Tech Full Simo Electric Motor Co. Ltd. ("Xi'an Simo") in October 2009 contributed approximately $44 million in the fourth quarter. Excluding this acquisition, sales in the fourth quarter increased 82% year over year. The higher sales were primarily driven by increased sales in all product lines resulting from strong economic growth in China . The linear motor propulsion systems developed by the Company for coal transportation trains contributed $7.3 million to total sales as the Company started the delivery during the quarter and 116 oil pumps were sold in 4Q09, up from 31 units in 4Q08.

Net income attributable to controlling interest in the quarter totaled $18.3 million ($0.59 per diluted share), up from $6.0 million ($0.27 per diluted share) in 4Q08. Excluding the $1.04 million non-cash charge for the change in fair value of warrants, adjusted net income for 4Q09 was $19.4 million ($0.62 per diluted share). The following table presents the reconciliation of non-GAAP measure to GAAP net income for the quarter versus 4Q08.

\*          \*          \*

For the year 2009, revenues increased by 85% to $223.2 million from $120.8 million in 2008. Strong sales growth resulted from the acquisition of Xi'an Simo ($44 million) as well as higher sales across all product lines. The Company delivered 519 oil pumps compared to 214 units in 2008. Linear motor propulsion systems developed for coal transportation trains contributed $7.3 million to our sales as the Company started to deliver units during the 4th quarter.

Net income attributable to controlling interest in 2009 totaled $19.6 million ($0.77 per diluted share), which included $24.2 million charges related to non-recurring and non-cash items. Excluding these non-recurring items and non-cash charges, adjusted net income attributable to controlling interest for 2009 was $43.8 million ($1.71 per diluted share) compared to net income of $1.19 per diluted share in 2008. The following table presents the reconciliation of non-GAAP measure to GAAP net income for full-year 2009 versus 2008.

\*          \*          \*

Overall gross profit margin declined to 34.3% in 2009 from 39.3% in 2008 due to changes in the product mix as sales of lower-margin industrial rotary motors expanded, in part as a result of the acquisition of Xi'an Simo. Operating profits in 2009 were $55.8 million compared to $34.4 million in 2008.

"We are extremely pleased to have delivered the best quarter and the best year in our Company's history despite weak economic conditions early on," said Mr.

- 9 -

Tianfu Yang , Chairman and Chief Executive Officer of Harbin Electric. "2009 was also a year of great strategic, operational and financial accomplishments as we further strengthened our leadership position in the electric motor industry in China . The acquisition of Xi'an Simo, one of China's leading electric motor companies, and its successful integration allowed us to start realizing synergies and provided a solid platform for continuous growth. Faster economic growth in the second half of the year fueled by the massive government stimulus program created a positive environment for our business. On the financial front, we raised additional equity capital which allowed us to repay a significant portion of our existing indebtedness, complete the acquisition of Xi'an Simo, and maintain a strong balance sheet as we continue to implement our growth strategy. We view these record results, accomplished with the hard work and dedication of our employees, as well as the continuous support of our shareholders, as a validation of our vision, strategic focus and relentless execution."

Looking ahead, Mr. Yang commented, "We are ready to move the Company forward to a sustained profitability in 2010 supported by a solid platform that we have built over the past years as we expect continuous growth and leverage our strong financial position and promising portfolio of products. Although the first quarter is traditionally slower with the long Chinese new-year holiday, we do not expect this seasonality to impact our business significantly compared to the fourth quarter. We also expect that the Chinese government's commitment to sustainable economic growth and the accelerated industrialization and urbanization of China will continue to drive our business and support our long term growth objectives. We look forward to a productive 2010 as we continue to capture the synergies of the Xi'an Simo acquisition, advance R&D and strengthen growth in all core businesses. We believe that 2010 will be another strong year for Harbin Electric and we remain committed to our strategies to achieve both our near and long term goals and maximize value for our shareholders."

21.     These results in turn followed still other excellent results.  As a consequence, the Company's stock traded at nearly $25 per share in mid-2010, and analysts had target prices substantially higher than that.

## THE BUYOUT

22.     On October 11, 2010, Harbin's shareholders were dismayed when they learned that defendants had been diligently working to sell Harbin – to themselves.  The Company issued a release entitled "Harbin Electric, Inc. Announces Receipt of 'Going Private' Proposal at $24.00 Per Share," which stated:

Harbin Electric, Inc. ("Harbin" or the "Company"), a leading developer and manufacturer of a wide array of electric motors in the People's Republic of China, today announced that its Board of Directors has received a proposal letter from its Chairman and Chief Executive Officer, Mr. Tianfu Yang ("Mr. Yang") and Baring Private Equity Asia Group Limited ("Baring") for Mr. Yang and an investment fund advised by Baring (the "Baring Fund") to acquire all of the outstanding shares of Common Stock of Harbin not currently owned by Mr. Yang and his affiliates in a going private transaction for $24.00 per share in cash, subject to certain conditions. Mr Yang owns 31.1% of Harbin's Common Stock. According to the proposal letter,

- 10 -

an acquisition vehicle for the purpose of completing the acquisition will be formed and the acquisition is intended to be financed with a combination of debt and equity capital. The proposal letter states that the equity portion of the financing would be provided by Mr. Yang, the Baring Fund and related sources. The proposal letter also states that Goldman Sachs (Asia) LLC ("Goldman") is acting as financial advisor to the acquisition vehicle to be formed by Mr. Yang and the Baring Fund:

Harbin's Board of Directors has formed a special committee of independent directors consisting of David Gatton, Boyd Plowman and Ching Chuen Chan (the "Special Committee") to consider this proposal. The Special Committee intends to retain independent advisors, including an independent financial advisor, to assist it in its work. No decisions have been made by the Special Committee with respect to Harbin's response to the proposal. There can be no assurance that any definitive offer will be made, that any agreement will be executed or that this or any other transaction will be approved or consummated.

23.     The release was false and misleading as the defendants were aware that the so-called "Special Committee" was appointed for the sole purpose of immunizing defendants from liability for their unlawful conduct and the approval of a sale of Harbin to the Buyout Group was a *fait accompli*. Moreover, the $24 per share offered does not properly take into account the expected growth in earnings potential that the Company can expect from its assets and operations.

## DEFENDANTS FAILED TO MAXIMIZE SHAREHOLDER VALUE

24.     As a result of defendants' conduct, Harbin's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company. In order to meet their fiduciary duties, defendants are obligated to refrain from structuring a preferential deal for themselves.

25.     The process used to sell Harbin was defective and did not reflect the true inherent value of the Company, which far exceeds the $24 per share Buyout offer.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action on her own behalf and as a class action on behalf of all holders of Harbin stock who are being and will be harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

27.     This action is properly maintainable as a class action.

28.     The Class is so numerous that joinder of all members is impracticable. According to Harbin's SEC filings, there were more than 31 million shares of Harbin common stock outstanding

1  as of August 6, 2010.

2      29.    There are questions of law and fact which are common to the Class and which

3  predominate over questions affecting any individual Class member. The common questions include,

4  *inter alia*, the following:

5      (a)    whether the Individual Defendants are breaching their fiduciary duties of

6  undivided loyalty, independence or due care with respect to plaintiff and the other members of the

7  Class in connection with the Buyout;

8      (b)    whether defendants are engaging in self-dealing in connection with the

9  Buyout;

10      (c)    whether defendants are unjustly enriching themselves and other insiders or

11  affiliates of Harbin;

12      (d)    whether the Individual Defendants are breaching any of their other fiduciary

13  duties to plaintiff and the other members of the Class in connection with the Buyout, including the

14  duties of good faith, diligence, honesty and fair dealing;

15      (e)    whether the Individual Defendants are breaching their fiduciary duties of

16  candor to plaintiff and the other members of the Class in connection with the Buyout by failing to

17  disclose all material information concerning the Buyout;

18      (f)    whether defendants, in bad faith and for improper motives, are impeding or

19  erecting barriers to discourage other offers for the Company or its assets;

20      (g)    whether the Buyout terms are unfair and inadequate to plaintiff and the Class;

21  and

22      (h)    whether plaintiff and the other members of the Class would be irreparably

23  harmed were the Buyout complained of herein consummated.

24      30.    Plaintiff's claims are typical of the claims of the other members of the Class and

25  plaintiff does not have any interests adverse to the Class.

26      31.    Plaintiff is an adequate representative of the Class, has retained competent counsel

27  experienced in litigation of this nature and will fairly and adequately protect the interests of the

28  Class.

32.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

33.    Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

34.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

35     Plaintiff repeats and realleges each allegation set forth herein.

36.    The Individual Defendants are knowingly or recklessly and in bad faith violating fiduciary duties of care, loyalty, good faith, candor and independence owed to the public shareholders of Harbin and have acted to put their personal interests ahead of the interests of Harbin shareholders.

37.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and as a part of a common plan, have acted knowingly or recklessly and in bad faith.

38.    The Individual Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by approving the Buyout without regard to the fairness of the transaction to Harbin shareholders and by failing to disclose all material information concerning the Buyout to such shareholders.

39.    As demonstrated by the allegations above, the Individual Defendants are knowingly or recklessly failing to exercise the care required, and breaching their duties of loyalty, good faith, candor and independence owed to the shareholders of Harbin because, among other reasons:

(a)    they are taking steps to avoid competitive bidding, to cap the price of Harbin

stock and to give the Buyout Group an unfair advantage, by, among other things, failing to solicit other potential acquirers or alternative transactions;

(b)   they are ignoring or are not protecting against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Buyout; and

(c)   they are failing to disclose all material information that would permit Harbin stockholders to cast a fully informed vote on the Buyout, including both financial information and regulatory information which may materially affect the Company and the Company's shareholders.

40.   Because the Individual Defendants dominate and control the business and corporate affairs of Harbin, and are in possession of private corporate information concerning Harbin's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Harbin which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

41.   By reason of the foregoing acts, practices and course of conduct, the Individual Defendants are knowingly or recklessly and in bad faith failing to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

42.   Unless enjoined by this Court, the Individual Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to plaintiff and the Class, and may consummate the proposed Buyout which will exclude the Class from its fair share of Harbin's valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable harm of the Class.

43.   The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties to the members of the Class.

44.   As a result of defendants' unlawful actions, plaintiff and the other members of the Class are being harmed in that defendants will deprive plaintiff and the Class of a fair sale process. Unless the proposed Buyout is enjoined by the Court, the Individual Defendants will continue to

knowingly or recklessly and in bad faith breach their fiduciary duties owed to plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Buyout terms, and will not supply to Harbin's minority stockholders sufficient information to enable them to cast informed votes on the proposed Buyout and may consummate the proposed Buyout, all to the irreparable harm of the members of the Class.

45.     Plaintiff and the members of the Class have an inadequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

### Claim for Aiding and Abetting Breaches of Fiduciary Duty Against Harbin

46.     Plaintiff repeats and realleges each allegation set forth herein.

47.     Harbin aided and abetted the Individual Defendants in breaching their fiduciary duties owed to the public shareholders of Harbin, including plaintiff and the members of the Class.

48.     The Individual Defendants owed to plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

49.     By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiff and the members of the Class.

50.     Harbin colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and was an active and knowing participant in the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the members of the Class.

51.     Plaintiff and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in her favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Declaring and decreeing that any Buyout agreement entered into by the Company was

- 15 -

1  approved in breach of the fiduciary duties of defendants and is therefore unlawful and

2  unenforceable;

3       C.    Enjoining defendants, their agents, counsel, employees and all persons acting in

4  concert with them from consummating the Buyout, unless and until the Company adopts and

5  implements a fair sale process;

6       D.    Directing defendants to exercise their fiduciary duties to obtain a transaction which is

7  in the best interests of Harbin's shareholders;

8       E.    Rescinding, to the extent already implemented, the Buyout or any of the terms

9  thereof;

10      F.    Awarding plaintiff the costs and disbursements of this action, including reasonable

11  attorneys' and experts' fees; and

12      G.    Granting such other and further equitable relief as this Court may deem just and

13  proper.

14  DATED: October 13, 2010         THE O'MARA LAW FIRM, P.C.
                               WILLIAM M. O'MARA

15                                   DAVID C. O'MARA

16

17                                   DAVID C. O'MARA

18
                               311 East Liberty Street
19                                 Reno, NV  89501
                               Telephone: 775/323-1321
20                                 775/323-4082 (Fax)

21                                 ROBBINS GELLER RUDMAN
                                   & DOWD LLP
22                                 DARREN J. ROBBINS
                               RANDALL J. BARON
23                                 A. RICK ATWOOD, JR.
                               DAVID T. WISSBROECKER
24                                 DAVID A. KNOTTS
                               EUN JIN LEE
25                                 655 West Broadway, Suite 1900
                               San Diego, CA  92101
26                                 Telephone: 619/231-1058
                               619/231-7423 (fax)
27

28

                                   - 16 -

1

2

GUILFORD BRAZILLO, LLP
HAMILTON LINDLEY
2501 North Harwood Street, Suite 1801
Dallas, TX 75201
Telephone: 214/583-2233
214/583-2234 (fax)

Attorneys for Plaintiff

3

4

5   S:\cp\Diane\Eear\cpl Holton Electric.doc

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

## AFFIRMATION
### (Pursuant to NRS 239B.030)

The undersigned does hereby affirm that the preceding document filed in the above-entitled matter

__X__          Document does not contain the social security number of any person

-OR-

___          Document contains the social security number of a person as required by:

_____  A specific state or federal law, to wit:

-or-

___  For the administration of a public program

-or-

___  For an application for a federal or state grant

-or-

___  Confidential Family Court Information Sheet (NRS 125.130, NRS 125.230 and NRS 125B.055)

DATED:  October 13, 2010.

THE O'MARA LAW FIRM, PC

By _____
          DAVID C. O'MARA, ESQ.

# EXHIBIT E

1
*COMP*
GRIFFITH H. HAYES, ESQ.
2
Nevada Bar No. 7374
MARTIN A. MUCKLEROY, ESQ.
3
Nevada Bar No. 9634
COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
4
A Professional Corporation
3930 Howard Hughes Parkway, Suite 200
5
Las Vegas, Nevada 89169
Telephone: (702) 949-3100
6
Facsimile: (702) 949-3104
7

8
Attorneys for Plaintiff Luis Necuze

9
DISTRICT COURT
10
CLARK COUNTY, NEVADA
11

12

13
LUIS NECUZE, Individually and on Behalf of
All Others Similarly Situated,
14
15
                                    Plaintiff,
16
            vs.
17
HARBIN ELECTRIC, INC., TIANFU YANG,
LANXIANG GAO, CHING CHUEN CHAN,
18
DAVID GATTON, YUNYUE YE, BOYD
PLOWMAN, and BARING PRIVATE EQUITY
19
ASIA GROUP, LTD.,
20
                                    Defendants.
21
22

23
CLASS ACTION COMPLAINT
24
    Plaintiff Luis Necuze ("Plaintiff"), on behalf of himself and all others similarly situated, by
25
his attorneys, alleges the following upon information and belief, except as to those allegations
26
pertaining to Plaintiff which are alleged upon personal knowledge:
27
28

Case Number A – 1 0 – 6 2 7 4 2 5 – C
Department No.:   X V I

SHAREHOLDER CLASS ACTION
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY

JURY TRIAL DEMANDED

Electronically Filed
10/15/2010 02:39:04 PM

CLERK OF THE COURT

1

## NATURE OF THE ACTION

1.      This is a shareholder class action complaint on behalf of the holders of the common stock of Harbin Electric, Inc. ("Harbin" or the "Company") against the Company and its board of directors ("Board" or the "Individual Defendants"), arising out of their breaches of fiduciary duty and/or aiding and abetting such breaches of fiduciary duty in connection with a proposed "going private" transaction for grossly inadequate consideration (the "Proposed Transaction").

2.      The Proposed Transaction was detailed in a letter (the "Proposal Letter") sent from Harbin's Chairman and Chief Executive Officer ("CEO"), Tianfu Yang ("Yang"), along with an investment fund advised by Baring Private Equity Asia Group, Ltd. (the "Baring Fund"), to Harbin's Board and announced in a press release on October 11, 2010. Pursuant to the Proposal Letter, Yang and Baring Fund seek to acquire all of the outstanding shares of common stock of the Company not currently owned by Yang and his affiliates for $24.00 per share in cash, for a total transaction value of $753.2 million. Yang currently owns 31.1% of the Company's common stock.

3.      According to the Proposal Letter, an acquisition vehicle for the purpose of completing the acquisition will be formed and the acquisition is intended to be financed with a combination of debt and equity capital. The Proposal Letter states that the equity portion of the financing will be provided by defendant Yang, the Baring Fund and related sources. The Proposal Letter also states that Goldman Sachs (Asia) LLC ("Goldman") is acting as financial advisor to the acquisition vehicle to be formed by Yang and the Baring Fund.

4.      Plaintiff alleges that he, along with all other public shareholders of Harbin common stock, is entitled to enjoin the Proposed Transaction. Not only is the consideration offered to Harbin shareholders grossly inadequate, but the negotiation and structure of the Proposed Transaction are the result of an unfair process that lacked full and fair disclosure of all material information.

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

5.      In pursuing their unlawful objective to squeeze out Harbin's public shareholders, the Individual Defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and they have also aided and abetted such breaches by other Harbin officers and directors, as well as the Baring Fund.  Although a Special Committee was formed by the Company to evaluate the Proposed Transaction, this committee is beholden to defendants Yang and, thus, is not capable of a fair evaluation of the Proposed Transaction.

6.      The Proposed Transaction will deprive Harbin shareholders of adequate consideration in light of the Company's growth, anticipated operating results, net asset value, and future profitability.  Under these facts and circumstances, the decision of the Individual Defendants to consider the Proposed Transaction constitutes nothing more than a sham and breach of their fiduciary duties.

7.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin defendants from taking any steps to consummate the Proposed Transaction.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that is incorporated in, conducts business in, and maintains operations in this County, or is an individual who has sufficient minimum contacts with the State of Nevada so as to render the exercise of jurisdiction by the Nevada courts permissible under traditional notions of fair play and substantial justice.

9.      This action is not removable under the Securities Litigation Uniform Standard Act ("SLUSA"), 15 U.S.C. § 78bb(f), because this action is based upon the statutory or common law of the State of Nevada, in which Harbin is incorporated and seeks injunctive relief.  Additionally, this action involves: (1) a communication with respect to the sale of Harbin common stock; (2) that was made by and on behalf of Harbin to its shareholders; and (3) concerns decisions of Harbin

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

3

COOSSEY, TOOLEN, GAGE, DUFFY & WOOG

1   shareholders with respect to voting their securities, or acting in response to a possible acquisition

2   offer.

3       10.     Venue is proper in this Court as the conduct at issue took place and had effect in

4   this County.

5                                      **PARTIES**

6       11.     Plaintiff currently holds shares of common stock of Harbin and has held such

7   shares since prior to the wrongs complained of herein;

8

9       12.     Defendant Harbin is a Nevada corporation with its United States Headquarters

10  located at 20 Ramblewood Road, Shoreham, NY 11786. Harbin develops, engineers, manufactures

11  and sells an array of industrial electric motors, customized linear motors, controller automation

12  systems, automobile specialty micro-motors, and other special motors. The Company operates,

13  through its indirect wholly owned subsidiary, Harbin Tech Full Electric Co., Ltd. The Company

14  offers three key product lines: Industrial electric motors, linear motors and their integrated

15  application systems, and automobile specialty micro-motors.

16

17      13.     Defendant Yang has been the Chairman of the Board and CEO of Harbin since

18  January 2005. Yang has been Chairman and CEO of Harbin Tech Full Electric Co., Ltd. since May

19  2003. Yang has been Chairman and CEO of Harbin Tech Full Industry Co., Ltd. since 2000. From

20  1994 to 2000, Yang was President of Harbin Tianheng Wood Industry Manufacture Co., Ltd.

21  Defendant Yang currently owns 31.2% of Harbin's common stock.

22      14.     Defendant Lunxiang Gao ("Gao") is a member of the Company's Board. Gao

23  has served as Chief Operating Officer ("COO") of Shanghai Tech-Full Electric, Co., Ltd., a wholly-

24  owned subsidiary of the Company, since September 2007.

25

26      15.     Defendant Ching Chuen Chan ("Chan") has served as a member of the

27  Company's Board since February 2005.

28      16.     Defendant David Gatton ("Gatton") has served as a member of the Company's

                                            4

Board since February 2005.

17.    Defendant Yunyue Ye ("Ye") has served as a member of the Company's Board since 2006.

18.    Defendant Boyd Plowman ("Plowman") has served as a member of the Company's Board since December 2009.

19.    Defendants Yang, Gao, Chan, Gatton, Ye and Plowman are collectively referred to hereinafter as the "Individual Defendants."

20.    The Individual Defendants owe fiduciary duties including good faith, loyalty, fair dealing, due care and candor to Harbin and its shareholders.

21.    Defendant Baring Fund is the largest regional growth equity firm in Asia with $2.5 billion under management. The firm specializes in growth equity investments and mid-market buyouts targeting growing businesses that require capital for expansion, recapitalization or for M&A. Primary investment markets include China, India, Japan, Singapore, Hong Kong, and Taiwan.  Baring Fund maintains its principal executive offices at Suite 3801, Two International Finance Centre, 8 Finance Street, Central, Hong Kong.

22.    The Individual Defendants and the Baring Fund are sometimes collectively referred to herein as the "Management Buyout Group."

## THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

23.    By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other shareholders of Harbin and owe Plaintiff and the other members of the Class (defined herein) the duties of good faith, fair dealing, loyalty and full and candid disclosure.

24.    By virtue of their positions as directors and/or officers of Harbin, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Harbin to engage in the practices complained of herein.

5

25.      Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person. In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision. To diligently comply with this duty, the directors of a corporation may not take any action that:

    (a)      adversely affects the value provided to the corporation's shareholders;

    (b)      contractually prohibits them from complying with or carrying out their fiduciary duties;

    (c)      discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

    (d)      will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

### CLASS ACTION ALLEGATIONS

26.      Plaintiff brings this action pursuant to Nevada Rule of Civil Procedure 23, individually and on behalf of the Class. The Class specifically excludes defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the defendants.

27.      This action is properly maintainable as a class action.

28.      The Class is so numerous that joinder of all members is impracticable. As of August 6, 2010, Harbin had in excess of 31 million shares of common stock outstanding. Members of the Class are scattered throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

29.     Questions of law and fact exist that are common to the Class, including, among others:

(a)     whether the Individual Defendants have fulfilled and are capable of fulfilling their fiduciary duties owed to Plaintiff and the Class;

(b)     whether the Individual Defendants have engaged and continue to engage in a scheme to benefit themselves at the expense of Harbin shareholders in violation of their fiduciary duties;

(c)     whether the Individual Defendants are acting in furtherance of their own self interest to the detriment of the Class;

30.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

31.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

32.     Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

7

## SUBSTANTIVE ALLEGATIONS

A.   **Background**

33.     Founded in the late 1990s, Harbin is a developer and manufacturer of an extensive line of electric motors with a focus on innovative, customized and value-added products. Its major product lines include linear motors, automobile specialty micro-motors, and industrial rotary motors.

34.     The Company's products are purchased by a broad range of domestic and international customers, including those involved in the energy industry, factory automation, food processing, packaging, transportation, automobile, medical devices, machinery and tool manufacturing, chemical, petrochemical, as well as in the metallurgical and mining industries. The Company has built a strong research and development capability by recruiting talent worldwide and through collaborations with top scientific institutions. The Company owns numerous patents in China and has developed award-winning products for its customers. Through its U.S. and China-based subsidiaries, the Company operates four manufacturing facilities in China located in Xi'an, Weihai, Harbin, and Shanghai.

35.     Since its initial public offering, Harbin has demonstrated the ability to identify, acquire, and integrate accretive acquisitions. Through this process, the Company has expanded its operations both by acquisition and the organic growth of its facilities with a focus on the rapidly growing linear motor and micro motor segments of its business. As a result of this growth, Harbin has attracted and retained numerous customers that continue to fuel the Company's growth.

36.     ·For example, China's linear motor industry is fast-growing. Historically, traditional rotary motors have been used in various industries throughout China, but performance and efficiency issues associated with traditional rotary motors have spurred industry to consider alternatives such as linear motors, as they allow for better designs, efficiency and precision of movement.

37. The Company has focused on increasing its presence in this fast growing linear motor segment of the market, and has attracted and retained some of the market's largest customers and partners such as Daqing Petroleum and Changchun Railway. Moreover, since Harbin has the only domestically produced linear motor technology for subway trains, Harbin is optimally positioned to capitalize on this market as the production of subway trains transitions to linear motors.

38. Similarly, micro-motors such as those produced by Harbin are widely used in applications such as automobile interior automation, medical devices, communication equipment, information systems, home appliances, defense industry, and many other industrial applications. China has now become the leading micro-motor supplier in the world in the automotive specialty micro motors business. Once again, in this rapidly growing segment of the market, Harbin has attracted and retained some of the industry's largest customers, such as Magna International, as substantial customers.

39. As a result of Harbin's expansion, efficient operation of its facilities and efforts to increase sales in its linear motor and micro motor markets, the Company has reported consistently rising revenues and earnings over the past three quarters. For example, on March 11, 2010, Harbin reported earnings results for fourth quarter and full year of 2009. For the fourth quarter the Company reported net income of $18,319,775 or $0.59 per diluted EPS on revenues of $107,213,986 compared to net income of $6,040,852 or $0.27 per diluted EPS on revenues of $34,743,375 for the same period a year ago, *a staggering increase of nearly 300%*. Operating income was $25,962,245 compared to operating income of $7,013,528 for the same quarter the prior year.

40. Similarly, on May 11, 2010, Harbin announced unaudited consolidated financial results for the first quarter ended March 31, 2010. For the period, the Company reported revenues of $105,485,157 against $30,724,893 from the prior year, and income from operations of $27,731,117 compared to $8,025,592 a year ago. Income before provision for income taxes was $26,969,402

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

9

against $9,697,008 a year ago, and net income was $20,553,688 or $0.66 per diluted share against $8,654,334 or $0.39 per diluted share a year ago.

41.     Once again, on August 10, 2010, Harbin reported unaudited consolidated earnings results for the second quarter and six months June 30, 2010. *For the quarter, the Company's total revenues were $105.44 million, up 175% from $38.36 million in the second quarter of 2009.* The significant sales growth was mainly the result of higher sales across all product lines and a contribution of $44.57 million from the newly acquired production facility in Xi'an which was acquired in October 2009. *Operating income was $28.08 million, up 219% from $8.82 million in the second quarter of 2009. Higher operating income was mainly due to increased sales, the acquisition of Xi'an, and improved operating efficiency.* The company recorded a net income attributable to controlling interest of $25.67 million or $0.82 per diluted share, compared with a net loss of $5.42 million or a loss of $0.24 per diluted share in the second quarter of 2009. For the six months, the company's total revenues were $210.92 million compared with $69.1 million a year ago. Operating income was $55.8 million compared with $16.8 million a year ago. The Company recorded net income of $46.23 million or $1.47 per diluted share, compared with a net income of $3.23 million or $0.14 per diluted share in the same quarter the prior year.

42.     Due the Company's efforts to expand its linear motor and micro motor business, DailyFinance.com reported:

> The company has next-generation motors that will be essential for China's growing economy and should maintain premium margins. So, it should be no surprise that Harbin's management wants to own the company.

43.     Thus, Harbin has achieved the above levels of sales and net income without their highest margin businesses -- linear motors and automotive specialty micro motors -- yet reaching close to full potential. Linear motor sales should receive a large boost when the Company's motors for subway trains finish testing and begin production. Likewise, the Company's

1  automotive specialty micro motor sales should receive a boost with the recovery underway among

2  the North American auto parts suppliers.

3      44.      Despite the Company's recent financial success, the trading price of Harbin

4  stock does not reflect the true value of the Company. Beginning in the last quarter of 2008 at the

5  onset of the financial meltdown, U.S and Canadian exchange traded Chinese companies such as

6  Harbin, began trading at PE ratios below 10, while Hong Kong and Asian exchange traded

7  companies continued to trade at much higher PE ratios, with about 15 time EPS appearing to be the

8  norm.

9

10      45.      Nevertheless, based upon the Company's recent performance, a research report

11  authored by Brian Drab and Liping Cai, analysts with William Blair & Company, concluded that the

12  Company's stock should trade at ten times 2011 projected EPS of $3.40, implying a price target of

13  $34.00 per share. As further noted in the research report, however, beginning in early 2010, the

14  trading price of stocks in Chinese companies came under additional pressure due to fears of

15

16  tightening Chinese monetary policy:

17      Valuation and Conclusion. Although we have not formally published a 2011
    EPS estimate, we believe it is reasonable (and likely conservative) to assume

18      Harbin earnings will grow 15% in that year. Based on our 2010 EPS estimate of
    $2.97, this implies 2011 EPS near $3.40. Based on this preliminary figure, shares

19      currently trade at less than six times forward earnings. This multiple is below the
    peer-group average of 8 times. (The peer group used for comparison is composed

20      of small-cap China-based electrical products manufacturers.) *Harbin's forward
    multiple is also below the 10 to 11 times level sustained for several quarters*

21      *until early 2010, when valuation of many Chinese stocks came under pressure
    (largely because of fears regarding tightening monetary policy in China).* If the

22      stock were to again achieve a multiple closer to 10 times, it would result in more
    than 70% appreciation in the stock from today's price (based on our preliminary

23      2011 outlook). We continue to believe Harbin should trade at a modest premium

24      to peers given the company's higher margins, higher return on equity, and
    potential for upside to earnings if the company has success in any one of its

25      multiple major growth opportunities. We maintain our Outperform rating.

26

27      46.      Thus, the trading price of Harbin common stock is suffering the declines

28  suffered by all U.S. market traded Chinese companies and the general downturn in stock prices of all

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

Chinese companies due to fears of tightening monetary policy in China. Rather than permitting the Company's shares to trade freely to recover from this two-pronged temporary downturn and allowing its public shareholders to reap the benefits of the Company's recent acquisitions and strong future in the linear motor and micro motor markets, the Management Buyout Group have acted for their own benefit, and to the detriment of the Company's public shareholders, in making the Proposed Transaction. In so doing, the Management Buyout Group is effectively placing an artificially low value on the Company's stock price while it is suffering from effects of a lingering economic recession and fears of tightened monetary policy, but just when it is poised to capitalize on recent expansion and increased sales in the linear motor and micro motor markets.

**B.     The Proposed Transaction is Announced**

47.     On October 11, 2010 Harbin issued a press release announcing that its Board received the Proposal Letter from its Chairman and CEO, defendant Yang, and Baring Fund to acquire all outstanding shares of Harbin not currently owned by Mr. Yang and his affiliates in a going-private transaction for $24.00 per share in cash. The press release stated:

> Harbin Electric, Inc. ("Harbin" or the "Company") (Nasdaq:HRBN - News), a leading developer and manufacturer of a wide array of electric motors in the People's Republic of China, today announced that its Board of Directors has received a proposal letter from its Chairman and Chief Executive Officer, Mr. Tianfu Yang ("Mr. Yang") and Baring Private Equity Asia Group Limited ("Baring") for Mr. Yang and an investment fund advised by Baring (the "Baring Fund") to acquire all of the outstanding shares of Common Stock of Harbin not currently owned by Mr. Yang and his affiliates in a going private transaction for $24.00 per share in cash, subject to certain conditions. Mr. Yang owns 31.1% of Harbin's Common Stock. According to the proposal letter, an acquisition vehicle for the purpose of completing the acquisition will be formed and the acquisition is intended to be financed with a combination of debt and equity capital. The proposal letter states that the equity portion of the financing would be provided by Mr. Yang, the Baring Fund and related sources. The proposal letter also states that Goldman Sachs (Asia) LLC ("Goldman") is acting as financial advisor to the acquisition vehicle to be formed by Mr. Yang and the Baring Fund.

48.     By the acts, transactions, and courses of conduct alleged herein, defendants, individually, as part of a common plan and scheme, and/or aiding and abetting one another in total

COOLEY, TOOLEN, GAGE, DUFFY & WOOG

1   disregard of their fiduciary duties, are attempting to deprive Plaintiff and the Class of the true value

2   of their investment in the Company. Under the circumstances, however, the Individual Defendants

3   are obligated to explore all alternatives to maximize shareholder value.

4

5   49.     The consideration defendant Yang has offered to Harbin's stockholders is

6   grossly unfair, inadequate, and substantially below the fair or inherent value of the Company. It was

7   reported that this consideration represents a 20% premium to the closing price of Harbin stock the

8   day prior to the announcement. The consideration of $24.00 per share represents a substantial

9   discount from the price targets established by each analyst which covers the Company – *in one case*

10  *a discount of more than 50%.* Indeed, the presence of such an offer from a dominating shareholder

11  such as Yang has caused some analysts to downgrade their rating of the Company and reduce their

12  price targets.

13  50.     Prior to the announcement of the Proposed Transaction, Roth Capital Partners

14  maintained a $33.00 per share, 12 Month Price target. John Ma ("Ma"), a senior research analyst

15  with Roth Capital partners stated, in a research note issued on October 11, 2010:

16

17      At 8.3x/6.8x/6.0x our 2010/2011/2012 EPS estimates, the $24 bid reflects an
        opportunistic approach to recent pressure on valuations for U.S.-listed China
18      stocks. Before this announcement, our 12 month PT was $33, reflecting 11.5X our
        FY10 estimated EPS of $2.88 and 9X of FY11 estimated EPS of $3.54.
19

20      HRBN shares currently trade for ~6x 2010 earnings estimates, a significant
        discount to its peers. Global peers trade at 18x estimated FY10 earnings (in a
21      range of 14x to 23x), and Chinese peers trade for 21x (ranging from 12x to 28x).
        We note that several comparable firms do not possess the level of profitability and
22      earnings momentum as HRBN does. Our $33 price target is based on 9x our
        FY11 EPS estimate. Given the $24 take-private offer, our price target is pending
23      review.

24  51.     In a subsequent report by Roth Capital on October 13, 2010, Ma indicated "We

25  are reducing our [price target] from $33 to $26, following the buyout proposal from the CEO and

26

27  Baring Private Equity Asia, and we downgrade HRBN from BUY to NEUTRAL, as we believe the

28

COOLEY, TOLLEN, GAGE, DUFFY & WOOG

1   uncertainty of shareholder approval presents more downside risk than upside potential." Ma went on

2   to state:

3       The consistent low valuation that the market has awarded HRBN serves a strong
4       incentive for privatization. Over the past 24 months, HRBN shares have traded for
        an average P/E of 8.3x forward earnings. Despite four consecutive outperforming
5       quarters, HRBN shares only closed slightly above $24 for three days in the past
        12 months.

6                                            * * *

7       We note that the $24 bid is substantially below our price target of $33, which is
        based on 11.5x our estimated FY10 earnings.

8                                            * * *

9       The uncertainty of shareholder approval presents more downside risks should the
        MBO fails while the upside potential is limited, in our view. Accordingly, we
10      lower our price target to $26 from $33 and downgrade HRBN from BUY to
        NEUTRAL.
11

12      52.     Likewise, Tony Regans on Seeking Alpha, in an article entitled "Why I Want

13  More Than $24/Share for Harbin Electric" has compared Harbin to three other Chinese auto parts

14  suppliers: Sorl Auto Parts (SORL), Wonder Auto Technology (WATG), and China Automotive

15  Systems (CAAS), and found that "SORL trades at 10x 2010 EPS estimates, WATG at 12x, and

16  CAAS at roughly 16x 2010 EPS estimates. If you take the average of the three of 12.7x 2010 EPS

17  and multiply by HRBN's expected $2.91 in EPS for 2010, that results in a price target of $37."

18

19      53.     The Management Buyout Group's Proposed Transaction, represents an

20  opportunistic bid which seeks to capitalize on artificially depressed prices of North American-listed

21  Chinese companies. As discussed in the October 12, 2010, Global Hunter equity note:

22      US listed Chinese stocks have been depressed since the beginning of the year;
        many are trading at 5x-10x forward P/E.  In the last three months, Chinese
23      companies have also experienced very negative press and increasing scrutiny
        from investors. Many management teams have been frustrated with the current
24      valuations, which represent significant discounts to peers trading in the China
        domestic market and Hong Kong stock exchange.  We believe HRBN's
25      management buyout is a positive catalyst for the China space overall. HRBN
        could provide a blueprint to a broader PE driven buyout trend.
26

27      54.     This sentiment was reiterated in Canaccord Genuity ("Canaccord") equity

28  research note issued on October 12, 2010. According to Canaccord investments analyst, Michael

14

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

Deng, because of the disparity between the North American listed Chinese companies and the China or Hong Kong listed peers, a management led buyout such as the Proposed Transaction provides the perfect opportunity for the Management Buyout Group to reap windfall profits at the expense of public shareholders:

> North American-listed Chinese companies are trading at significant discounts to their China/HK-listed peers. This management buyout (MBO) indicates a way to capture such a valuation gap, in which a North American-listed Chinese company can be taken private and then potentially relisted in Hong Kong or Mainland China at a much higher valuation.

55.     As eluded to in the Global Hunter and Canaccord research notes, the Proposed Transaction represents at attempt by defendant Yang, who currently owns 31.1% of Harbin's Common Stock, to capitalize on Harbin's artificially depressed share price to the detriment of Harbin's public stockholders.

56.     Additionally, by carefully timing the issuance of the Proposed Transaction during a downturn in the price of Harbin's stock, defendants were able to claim that the price represented a premium of approximately 20% over the trading price immediately prior to the announcement on October 11, 2010. In fact, however, the price represents a substantial discount from the price targets established by each analyst which covers the Company – *in one case a discount of more than 50%*.

57.     If the Proposed Transaction is consummated, Harbin's public stockholders will be denied their right to share proportionately in the true value of the Company's valuable assets and future growth in profits and earnings.

58.     The Proposed Transaction is wrongful, unfair and harmful to Harbin's public stockholders, the class members. The deal represents an attempt by the defendants to aggrandize the personal and financial positions and interests of board members at the expense of the stockholders of the Company.

## FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

59.     Plaintiff repeats and realleges each allegation set forth herein.

60.     The Individual Defendants have violated fiduciary duties of care, loyalty, candor and good faith owed to public shareholders of Harbin.

61.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Harbin.

62.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Harbin because, among other reasons, they failed to take steps to maximize the value of Harbin to its public shareholders, by, among other things, failing to adequately consider potential acquirers, instead favoring their own, or their fellow directors or executive officers' interests to secure all possible benefits with a friendly suitor, rather than protect the best interests of Harbin's shareholders.

63.     The Individual Defendants dominate and control the business and corporate affairs of Harbin, and are in possession of private corporate information concerning Harbin's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Harbin which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

64.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

65.     As a result of the actions of defendants, Plaintiff and the Class will suffer irreparable harm in that they have not and will not receive their fair portion of the value of Harbin's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

66.     Unless defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

67.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable harm which defendants' actions threaten to inflict.

### SECOND CAUSE OF ACTION

### Claim Against Harbin and Baring Fund for Aiding and Abetting the Individual Defendants' Breach of Fiduciary Duty

68.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

69.     Harbin and Baring Fund have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Harbin's public shareholders, and have participated in such breaches of fiduciary duties.

70.     Harbin and Baring Fund knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Harbin and Baring Fund rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

71.     Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.     Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from effectuating the Proposed Transaction, unless and until the Company adopts

17

1   and implements a procedure or process to obtain a proposal providing the best possible terms for

2   shareholders;

3       C.      Rescinding, to the extent already implemented, the Proposed Transaction or any of

4   the terms thereof;

5

6       D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

7   attorneys' and experts' fees; and

8       E.      Granting such other and further equitable relief as this Court may deem just and

9   proper.

10  Dated: October 15, 2010                    COOKSEY, TOOLEN, GAGE, DUFFY &
                                               WOOG
11

12                                             By:
13                                             GRIFFITH H. HAYES, ESQ.
                                               Nevada Bar No. 7374
14                                             MARTIN A. MUCKLEROY, ESQ.
                                               Nevada Bar No. 9634
15                                             A Professional Corporation
                                               3930 Howard Hughes Parkway, Suite 200
16                                             Las Vegas, Nevada 89169
                                               Telephone:  (702) 949-3100
17                                             Facsimile:   (702) 949-3104
                                               Attorneys for Plaintiff
18

19

20                                             FARUQI & FARUQI, LLP
                                               Antonio Vozzolo
21                                             369 Lexington Ave., 10th Floor
                                               New York, New York 10017
22                                             Tel: 212-983-9330
                                               Fax: 212-983-9331
23

24                                             FARUQI & FARUQI, LLP
                                               Jacob A. Goldberg
25                                             Sandra G. Smith
                                               101 Greenwood Avenue, Suite 600
26                                             Jenkintown, PA 19046
                                               Tel: 215-277-5770
27                                             Fax: 215-277-5771
                                               *Attorneys for Plaintiff*
28

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG