# EXHIBIT F

Electronically Filed
10/19/2010 04:27:25 PM

CLERK OF THE COURT

1   COMP
Griffith H. Hayes, Esq.
2   Nevada Bar No. 7374
Martin A. Muckleroy, Esq.
3   Nevada Bar No. 9634
4   COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
A Professional Corporation
5   3930 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
6   Telephone: (702) 949-3100
Facsimile: (702) 949-3104
7

8   Seth D. Rigrodsky
Brian D. Long
9   RIGRODSKY & LONG, P.A.
919 North Market Street, Suite 980
10   Wilmington, Delaware 19801
Telephone: (302) 295-5310
11   Facsimile: (302) 654-7530

12

13   Attorneys for Plaintiff

14          EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
                     IN AND FOR THE COUNTY OF CLARK
15

16   JACQUELINE ELLIOTT, Individually and on      Case No. A-10-627656-C
     behalf of all others similarly situated,
17                                                 Dept No. X
                         Plaintiff,
18
19                  v.
20   HARBIN ELECTRIC, INC., TIANFU YANG,           CLASS ACTION COMPLAINT
     LANXIANG GAO, CHING CHUEN CHAN,
21   DAVID GATTON, YUNYUE YE, BOYD                  JURY TRIAL DEMANDED
     PLOWMAN,
22
23                       Defendants.
24

25          Plaintiff, by her undersigned attorneys, for her class action complaint against defendants,

26   alleges upon personal knowledge with respect to herself, and upon information and belief based,

27   inter alia, upon the investigation of counsel as to all other allegations herein, as follows:

28

405.0048 1258922.1

## NATURE OF THE ACTION

1.     Plaintiff brings this shareholder class action on behalf herself and all other public shareholders of Harbin Electric, Inc. ("Harbin" or the "Company") against the Company and its Board of Directors (the "Board" or "Individual Defendants"), arising from the proposed acquisition of the outstanding shares of Harbin common stock for $24.00 per share by Tianfu Yang, the Company's Chairman of the Board and Chief Executive Officer ("CEO"), and Baring Private Equity Asia Group Limited ("Baring"). In breach of the fiduciary duties that Harbin's directors, the above-named Individual Defendants, owe to the Company's shareholders (the "Proposed Transaction" or the "Proposal"). Plaintiff seeks enjoinment of the Proposed Transaction or, alternatively, rescission of the Proposed Transaction in the event defendants are able to consummate it.

## THE PARTIES

2.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Harbin common stock.

3.     Defendant Harbin is a Nevada corporation and maintains its principal executive offices at No. 9, Ha Ping Xi Lu, Ha Ping Lu Ji Zhong Qu, Harbin Kai Fa Qu, Harbin, China. Harbin, through its subsidiaries, engages in the design, development, manufacture, supply, and service of electric motors in the People's Republic of China and internationally.

4.     Defendant Tianfu Yang ("Yang") has served as Harbin's Chairman of the Board and CEO since January 24, 2005. According to the press release announcing the Company's receipt of the Proposal, Yang already owns approximately 31.1% of the Company's outstanding common stock, making Yang Harbin's largest shareholder. According to eth Company's Annual Proxy Statement filed with the United States Securities and Exchange Commission ("SEC") on Form DEF 14A on June 24, 2010 (the "2010 Proxy"), Yang has also served as: (a) Chairman and CEO of Harbin Tech Full Electric Co., Ltd. since May 2003; (b) Chairman and CEO of Harbin Tech Full Industry Co., Ltd. since 2000; and (c) President of Harbin Tianheng Wood Industry Manufacture Co. Ltd. from 1994 through 2000.

5.     Defendant Lanxiang Gao ("Gao") has been a Harbin director since September 26, 2008. According to the 2010 Proxy, Gao joined the Company in September 2007 as Chief Operating Officer ("COO") of Shanghai Tech Full Electric Co., Ltd., a Harbin wholly owned subsidiary.

6.     Defendant Ching Chuen Chan ("Chan") has been a Harbin director since February 1, 2005. According to the 2010 Proxy, Chan is chairman of the Company's Nominating and Corporate Governance Committee and is also a member of the Company's Audit Committee and the Compensation Committee.

7.     Defendant David Gatton ("Gatton") has been a Harbin director since February 1, 2005. According to the 2010 Proxy, Gatton is chairman of the Company's Compensation Committee and is a member of the Nominating and Corporate Governance Committee and the Audit Committee.

8.     Defendant Yunyue Ye ("Ye") has been a Harbin director since October 12, 2006.

9.     Defendant Boyd Plowman ("Plowman") has been a Harbin director since December 1, 2009. According to the 2010 Proxy, Plowman is chairman of the Company's Audit Committee and is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

10.    The defendants identified in ¶¶ 4-9 are collectively referred to herein as the "Individual Defendants."

11.    By reason of their positions as officers and/or directors of the Company, the Individual Defendants are in a fiduciary relationship with plaintiff and the other public shareholders of Harbin, and owe plaintiff, and Harbin's other shareholders the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure.

12.    Each of the Individual Defendants at all relevant times had the power to control and direct Harbin to engage in the misconduct alleged herein. The Individual Defendants' fiduciary obligations required them to act in the best interest of plaintiff and all Harbin shareholders.

13.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Harbin, are obligated to:

(a)    objectively evaluate any reasonable proposed transaction, including the Proposed Transaction, to determine whether it is in the best interests of the Company and its public shareholders;

(b)    attempt to maximize shareholder value by considering all *bona fide* offers or strategic alternatives, including the Proposed Transaction; and

(c)    refrain from participating in any transaction in which they favor their own interests at the expense of Harbin and its public shareholders.

14.    The Company's public shareholders deserve to receive the maximum value for their shares through the Proposed Transaction.   Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, have violated and are continuing to violate the fiduciary duties they owe to plaintiff and the Company's other public shareholders, including the duties of loyalty, good faith, candor, and due care due to the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## CLASS ACTION ALLEGATIONS

15.    Plaintiff brings this action on his own behalf and as a class action, pursuant to Nevada Rule of Civil Procedure 23, on behalf of himself and all other public shareholders of Harbin (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

16.    This action is properly maintainable as a class action.

17.    The Class is so numerous that joinder of all members is impracticable.  As of August 6, 2010, there were 31,067,471 shares of Harbin common stock outstanding, held by hundreds or thousands of individuals and entities scattered throughout the country.

18.    Questions of law and fact are common to the Class, including, among others:

a.    Whether defendants have breached their fiduciary duties owed to plaintiff

1  and the Class; and

2          b.      Whether defendants will irreparably harm plaintiff and the other members

3  of the Class if defendants' conduct complained of herein continues.

4
5      19.    Plaintiff is committed to prosecuting this action and has retained competent

6  counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the

7  other members of the Class and plaintiff has the same interests as the other members of the

8  Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and

9  adequately protect the interests of the Class.

10     20.    The prosecution of separate actions by individual members of the Class would

11  create the risk of inconsistent or varying adjudications with respect to individual members of the

12  Class that would establish incompatible standards of conduct for defendants, or adjudications

13  with respect to individual members of the Class that would, as a practical matter, be dispositive

14  of the interests of the other members not parties to the adjudications or substantially impair or

15  impede their ability to protect their interests.

16     21.    Defendants have acted, or refused to act, on grounds generally applicable, and

17  causing injury to the Class and, therefore, final injunctive relief on behalf of the Class as a

18  whole is appropriate.

## SUBSTANTIVE ALLEGATIONS

19
20     22.    On August 9, 2010, Harbin issued a press release wherein it reported

21  significantly higher second quarter earning for the second quarter of 2010. Harbin reported total

22  revenues of $105.44 million, up 175% compared with $38.36 million in the second quarter of

23  2009, which was negatively impacted by the global financial crisis. According to the press

24  release, the significant sales growth was mainly the result of higher sales across all product lines

25  and a contribution of $44.57 million from Xi'an Tech Full Simo which was acquired in October

26  2009. Even excluding the acquisition, organic growth was 59% year over year.

27     23.    In addition, Harbin recorded a net income attributable to controlling interest of

28  $25.67 million ($0.82 per diluted share), compared with a net loss of $5.42 million (a loss of

$0.24 per diluted share) in the second quarter of 2009, which included a non-cash charge of

1   $14.01 million due to change in fair value of the warrants issued with the Company's 2010

2   Notes and 2012 Notes.   Moreover, the Company's adjusted net profit margin increased to

3   22.78% in the second quarter of 2010 from 19.35% in the second quarter of 2009, reflecting a

4   significant improvement in operating efficiency as a result of business integration and

5   consolidation.  Individual Defendant Yang was extremely pleased with the Company's vastly

6   improved results and its future prospects.  He stated, in relevant part:

7       *We are very pleased with our outstanding second quarter earnings[.]  Adjusted*
        *net income, by which we judge our management performance, was up 224%*
8       *year-over-year at $24.02 million.*  We have made remarkable progress in the
        restructuring and integration of Xi'an Tech Full Simo Motor, which has led to a
9       significant improvement in our operating efficiency.  During this quarter, we
        restructured its subsidiaries, acquiring full ownership in four partially owned
10      subsidiaries and disposing of non-strategic businesses.  *This brings us enhanced*
        *synergies across our diversified product lines and strengthens profit margins*
11      *and earnings power.*  While our top line benefited from the acquisition of Xi'an
        Tech Full Simo Motor, earlier strategic moves continued to add to revenues.
12      Weihai revenues were up 39% and oil pumps and coal transportation project
        performed strongly.
13

14  [Emphasis added].

15      24.     Harbin went on to report that operating income in the second quarter of 2010

16  totaled $28.08 million, compared with $8.82 million in the second quarter of 2009, representing

17  a 219% year over year growth.  The Company's higher operating income was mainly due to

18  increased sales, the acquisition of Xi'an Tech Full Simo, and improved operating efficiency.

19  Total operating costs including selling, general and administrative ("SG&A") expenses and

20  research & development (R&D) expenses totaled $7.25 million, compared with $4.05 million a

21  year ago.  Harbin's higher operating costs were mainly due to the addition of Xi'an Tech Full

22  Simo, higher expenses related to higher sales such as shipping and handling costs, higher

23  depreciation expense, and higher costs associated with the production start-up at the Company's

24  Shanghai facility.  As a percentage of total sales, total operating costs decreased from 10.6% to

25  6.9%.  Harbin's operating margin improved to 26.6% in the second quarter of 2010 from 23% in

26  the second quarter of 2009, reflecting a significant improvement in operating efficiency as a

27  result of business integration and consolidation.  Again, Individual Defendant Yang touted the

28  Company's prospects for future growth.  He stated, in relevant part:

4050648  1234402 1

1

### JURY TRIAL DEMAND

2    Plaintiff demands a trial by jury on all claims and issues so triable.

3    DATED: October 19, 2010

4                                          COOKSEY, TOOLEN, GAGE,
                                           DUFFY & WOOG
5

6
                                           Griffith H. Hayes, Esq.
7                                          Nevada Bar No. 7374
                                           Martin A. Muckleroy, Esq.
8                                          Nevada Bar No. 9632
                                           3930 Howard Hughes Parkway, Suite 200
9                                          Las Vegas, Nevada 89169
                                           Telephone:  (702) 949-3100
10                                         Facsimile:   (702) 949-3104

11

12                                         *Attorneys for Plaintiff*

13                                         OF COUNSEL:

14                                         Seth D. Rigrodsky
                                           Brian D. Long
15                                         **RIGRODSKY & LONG, P.A.**
                                           919 North Market Street, Suite 980
16                                         Wilmington, Delaware 19801
                                           Telephone: (302) 295-5310
17                                         Facsimile: (302) 654-7530

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G

1 THE O'MARA LAW FIRM, P.C.
WILLIAM M. O'MARA (Nevada Bar No. 837)
2 DAVID C. O'MARA (Nevada Bar No. 8599)
311 East Liberty Street
3 Reno, NV 89501
Telephone: 775/323-1321
4 775/323-4082 (fax)

5 Attorneys for Plaintiff

6 [Additional counsel appear on signature page.]

7

8                IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

9                              IN AND FOR CARSON CITY

10 RANDOLPH FISHER, Individually and on        )  Case No.
   Behalf of All Others Similarly Situated,     )  Dept No.
11                                               )
                        Plaintiff,               )  CLASS ACTION
12                                               )
        vs.                                      )  COMPLAINT BASED UPON BREACH OF
13                                               )  FIDUCIARY DUTIES
   HARBIN ELECTRIC, INC., TIANFU YANG,           )
14 CHING CHUEN CHAN, BOYD PLOWMAN,               )
   DAVID GATTON, YUNYUE YE and                   )
15 LANXIANG GAO,                                 )
                                                 )
16                      Defendants.              )
                                                 )

17

18

19

20

21

22

23

24

25

26

27

28

1    Plaintiff, by his attorneys, submits this complaint against the defendants named herein and

2  alleges as follows:

## SUMMARY OF THE ACTION

4    1.    This is a stockholder class action brought by plaintiff on behalf of the holders of

5  Harbin Electric, Inc. ("Harbin" or the "Company") common stock against Harbin and its Board of

6  Directors arising out of their efforts to complete a management-led buyout of Harbin via an unfair

7  process at a grossly inadequate and unfair price of $24 per share (the "Buyout"). The individuals

8  seeking to purchase the Company include Tianfu Yang ("Yang"), the Company's Chairman and

9  Chief Executive Officer, Hero Wave Investments Limited ("Hero"), a company affiliated with Yang

10  that, collectively with Yang, controls over 30% of the Company's common stock, and Baring Private

11  Equity Asia Group Limited, the largest regional growth equity firm in Asia (collectively referred to

12  as the "Buyout Group").

13    2.    In pursuing the unlawful plan to squeeze out Harbin's public stockholders for grossly

14  inadequate consideration, and without a fair process, including full and fair disclosure of all material

15  information, the defendants have breached their fiduciary duties of loyalty, due care, independence,

16  candor, good faith and fair dealing, and/or have aided and abetted such breaches by Harbin officers

17  and directors. Instead of attempting to obtain the highest price reasonably available for the

18  Company's stockholders, defendants are spending a substantial effort to tailor the Buyout to meet the

19  specific needs of the Buyout Group.

20    3.    Because defendants dominate and control the business and corporate affairs of Harbin

21  and are in possession of private corporate information concerning Harbin assets, business and future

22  prospects, there exists an imbalance and disparity of knowledge and economic power between them

23  and the public shareholders of Harbin, which makes it inherently unfair for them to pursue any

24  proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing

25  stockholder value.

26    4.    In short, the Buyout is designed to unlawfully divest Harbin's public stockholders of

27  a large portion of the valuable assets of the Company for grossly inadequate consideration.

28  Defendants know that the Company possesses numerous assets that will continue to produce

1  substantial revenue and earnings, which defendants wish to keep for themselves. Although the

2  Company has formed a so-called Special Committee to evaluate the Buyout, the Buyout is

3  essentially a *fait accompli* because the Special Committee is acting to appease the Buyout Group,

4  which has no interest in a fair evaluation of the Buyout. Accordingly, plaintiff seeks to enjoin the

5  Buyout.

6  ## JURISDICTION AND VENUE

7      5.    This Court has jurisdiction over each defendant named herein because each defendant

8  is either a corporation that conducts business in and maintains operations in this County, or is an

9  individual who has sufficient minimum contacts with Nevada so as to render the exercise of

10  jurisdiction by the Nevada courts permissible under traditional notions of fair play and substantial

11  justice.

12      6.    Venue is proper in this Court because Harbin is incorporated in Nevada and

13  defendants include officers and/or directors of a Nevada corporation.

14  ## PARTIES

15      7.    Plaintiff Randolph Fisher is, and at all times relevant hereto was, a shareholder of

16  Harbin.

17      8.    Defendant Harbin is a holding company incorporated in Nevada. Through its U.S. and

18  China-based subsidiaries, it designs, develops, manufactures, supplies, and services a wide range of

19  electric motors, including linear motors, specialty micro-motors, and industrial rotary motors, with a

20  focus on innovation, creativity, and value-added products.

21      9.    Defendant Yang is and at all relevant times has been the Chairman and Chief

22  Executive Officer of Harbin. Yang beneficially owns 31.11% of the Company's common stock.

23      10.    Defendants Ching Chuen Chan, Boyd Plowman, David Gatton, Yunyue Ye, and

24  Lanxiang Gao are, and at all relevant times have been, members of Harbin's Board of Directors.

25      11.    The defendants named above in ¶¶9-10 are collectively referred to herein as the

26  "Individual Defendants."

27  ## DEFENDANTS' FIDUCIARY DUTIES

28      12.    Where the directors of a publicly traded corporation undertake a transaction that will

- 2 -

1  result in either: (i) a change in corporate control; or (ii) a break up of the corporation's assets, the

2  directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for

3  the corporation's shareholders, and if such transaction will result in a change of corporate control,

4  the shareholders are entitled to receive a significant premium.  To diligently comply with these

5  duties, the directors and/or officers may not take any action that:

6          (a)  adversely affects the value provided to the corporation's shareholders;

7          (b)  will discourage or inhibit alternative offers to purchase control of the

8  corporation or its assets;

9          (c)  contractually prohibits themselves from complying with their fiduciary duties;

10         (d)  will otherwise adversely affect their duty to search and secure the best value

11 reasonably available under the circumstances for the corporation's shareholders; and/or

12         (e)  will provide the directors and/or officers with preferential treatment at the

13 expense of, or separate from, the public shareholders.

14     13.  In accordance with their duties of loyalty and good faith, the Individual Defendants,

15 as directors and/or officers of Harbin, are obligated under Nevada law to refrain from:

16         (a)  participating in any transaction where the directors' or officers' loyalties are

17 divided;

18         (b)  participating in any transaction where the directors or officers receive, or are

19 entitled to receive, a personal financial benefit not equally shared by the public shareholders of the

20 corporation; and/or

21         (c)  unjustly enriching themselves at the expense or to the detriment of the public

22 shareholders.

23     14.  Plaintiff alleges herein that defendants, separately and together, in connection with

24 the Buyout, are knowingly or recklessly violating their fiduciary duties, including their duties of

25 loyalty, good faith and independence owed to plaintiff and other public shareholders of Harbin.

26 Defendants stand on both sides of the transaction, are engaging in self dealing, are obtaining for

27 themselves personal benefits, including personal financial benefits, not shared equally by plaintiff or

28 the Class, and are choosing not to provide shareholders with all information necessary to make an

1   informed decision in connection with the Buyout and/or are aiding and abetting other defendants'

2   breaches. As a result of defendants' self dealing and divided loyalties, neither plaintiff nor the Class

3   are being treated fairly in connection with the proposed Buyout.

4        15.     Defendants also owe the Company's stockholders a duty of truthfulness under

5   Nevada law, which includes the disclosure of all material facts concerning the Buyout and,

6   particularly, the fairness of the price offered for the stockholders' equity interest. Defendants are

7   knowingly or recklessly breaching their fiduciary duties of candor and good faith by failing to

8   disclose all material information concerning the Buyout, and/or aiding and abetting other defendants'

9   breaches.

10       16.     Defendants are knowingly or recklessly breaching their duties of loyalty, good faith,

11   independence and candor in connection with the Buyout, and/or aiding and abetting other

12   defendants' breaches, and have the burden of proving the inherent or entire fairness of the Buyout,

13   including all aspects of its negotiation, structure, price and terms.

14                       **BACKGROUND**

15       17.     Harbin is a holding company incorporated in Nevada. Through its U.S. and China-

16   based subsidiaries, it designs, develops, manufactures, supplies, and services a wide range of electric

17   motors, including linear motors, specialty micro-motors, and industrial rotary motors, with a focus

18   on innovation, creativity, and value-added products.

19       18.     Harbin has recently reported excellent financial results and has tremendous prospects.

20   For example, in an August 9, 2010, press release entitled "Harbin Electric Reports Significantly

21   Higher Second-Quarter Earnings," the Company stated:

22       Harbin Electric, Inc. ("Harbin Electric" or the "Company"), a leading developer and
        manufacturer of a wide array of electric motors in the People's Republic of China,

23       today reported its financial results for the second quarter of 2010.

24       Financial Highlights

25       -- Total revenues were $105.44 million, up 175% from $38.36 million in 2Q09

26       -- Operating income totaled $28.08 million, up 219% from $8.82 million in 2Q09

27       -- Adjusted net income attributable to controlling interest was $24.02 million, up
        224% compared to $7.42 million in 2Q09

28

-- GAAP earnings per diluted share attributable to controlling interest were $0.82, compared to a net loss of $0.24 in 2Q09

-- Adjusted earnings per diluted share attributable to controlling interest were $0.77 per diluted share, compared to $0.33 in 2Q09

*     *     *

"We are very pleased with our outstanding second quarter earnings," said Mr. Yang, Chairman and Chief Executive Officer of Harbin Electric. "Adjusted net income, by which we judge our management performance, was up 224% year-over-year at $24.02 million. We have made remarkable progress in the restructuring and integration of Xi'an Tech Full Simo Motor, which has led to a significant improvement in our operating efficiency. During this quarter, we restructured its subsidiaries, acquiring full ownership in four partially owned subsidiaries and disposing of non-strategic businesses. This brings us enhanced synergies across our diversified product lines and strengthens profit margins and earnings power. While our top line benefited from the acquisition of Xi'an Tech Full Simo Motor, earlier strategic moves continued to add to revenues. Weihai revenues were up 39% and oil pumps and coal transportation project performed strongly."

Revenues

For the second quarter of 2010, total revenues were $105.44 million, up 175% compared with $38.36 million in the second quarter of 2009, which was negatively impacted by the global financial crisis. The significant sales growth was mainly the result of higher sales across all product lines and a contribution of $44.57 million from Xi'an Tech Full Simo which was acquired in October 2009. Excluding the acquisition, organic growth was 59% year over year.

By product line, linear motor sales were up 76% driven by higher oil pump sales (150 units in the second quarter of 2010 compared to 105 units in the second quarter of 2009) and revenues from coal transportation project ($5.31 million), which started to contribute in the fourth quarter of 2009. Sales of specialty micro motors were up 77% from the second quarter of 2009. Sales of industrial rotary motors increased from $17.00 million to $68.12 million including $44.57 million from Xi'an Tech Full Simo. Sales of rotary motors at Weihai Tech Full Simo totaled $23.56 million for the quarter, up 39% compared with $17 million in the second quarter of 2009.

International sales totaled $5.60 million, or 5.3% of total sales, for the quarter, an increase of 56% compared with $3.58 million in the second quarter of 2009, when the global economic downturn hit our international business severely. The international sales growth was driven primarily by increased sales in our specialty micro motor and rotary motor products.

*     *     *

Operating Income

Operating income in the second quarter of 2010 totaled $28.08 million, compared with $8.82 million in the second quarter of 2009, representing a 219% year over year growth. Higher operating income was mainly due to increased sales, the acquisition of Xi'an Tech Full Simo, and improved operating efficiency. Total operating costs including selling, general and administrative ("SG&A") expenses and

- 5 -

research & development (R&D) expenses totaled $7.25 million, compared with $4.05 million a year ago. The higher operating costs were mainly due to the addition of Xi'an Tech Full Simo, higher expenses related to higher sales such as shipping and handling costs, higher depreciation expense, and higher costs associated with the production start-up at our Shanghai facility. As a percentage of total sales, total operating costs decreased from 10.6% to 6.9%. Operating margin improved to 26.6% in the current quarter from 23.0% in the second quarter of 2009, reflecting a significant improvement in operating efficiency as a result of business integration and consolidation.

*       *       *

Outlook

"Despite concerns about the slowing down of the Chinese economy, we continue to see strong demand for many of our products. As we expect continued strong order volume for our rotary motors, our focus in the months ahead is to address production capacity constraints at our Weihai and Xi'an facilities. In our specialty motor lines including linear motors and specialty micro-motors, where speed of product development and market launch is the key to future growth, we have made substantial capital investments. We believe that capacity expansion and the expected and long-awaited launch of new products, coupled with our success in business integration, restructuring, and consolidation, will help us further extend our leadership position in the industry. "

19.     These tremendous results came on the heels of earlier excellent results.  As the Company stated in a May 10, 2010, press release entitled "Harbin Electric Delivers Record Quarterly Earnings":

Harbin Electric, Inc. ("Harbin Electric" or the "Company"), a leading developer and manufacturer of a wide array of electric motors in the People's Republic of China, today reported its financial results for the first quarter of 2010.

Financial Highlights

-- Total revenues were $105.49 million, up 243% from $30.72 million in 1Q09

-- Operating income totaled $27.73 million, up 246% from $8.03 million in 1Q09

-- Adjusted net income attributable to controlling interest (excluding non-cash item due to change in fair value of warrant) was $20.79 million, up 242% from $6.08 million in 1Q09

-- GAAP earnings attributable to controlling interest were $0.66 per diluted share, compared with $0.39 in 1Q09

-- Adjusted earnings attributable to controlling interest (excluding non-cash item due to change in fair value of warrant) were $0.66 per diluted share, compared with $0.27 in 1Q09

*       *       *

Revenues

In the first quarter of 2010, total sales more than tripled to $105.49 million compared to $30.72 million in 1Q09, which was negatively impacted by the global financial crisis. The acquisition of Xi'an Tech Full Simo Electric Motor Co. Ltd. ("Xi'an Simo") in October 2009 contributed $45.03 million. Excluding this acquisition, sales increased by 97% year over year. The higher sales were primarily driven by increased sales in all product lines resulting from strong economic recovery in China.

By product line, linear motor sales were up 60% driven by higher oil pumps sales (105 units in 1Q10 compared to 30 units in 1Q09) and sales from our linear motor propulsion systems developed for coal transportation trains ($5.5 million), which started to contribute in the fourth quarter of 2009. Sales of specialty micro motors were up 165% from 1Q09. Sales of industrial rotary motors increased from $10.8 million to $67.5 million including $45.03 million from Xi'an Simo. Sales of rotary motors at our Weihai facility more than doubled.

International sales totaled $7.06 million, up 117% compared with $3.26 million in 1Q09, when the global economic downturn hit our international business severely. The international sales growth was driven by increased sales in our specialty micro motor and rotary motor products.

\*     \*     \*

Net Income

Net income attributable to controlling interest in the quarter totaled $20.55 million ($0.66 per diluted share), up 137% from $8.65 million ($0.39 per diluted share) in 1Q09. Excluding non-cash charges due to the change in fair value of warrants related to the debt issued in 2006, adjusted net income attributable to controlling interest in the quarter totaled $20.79 million ($0.66 per diluted share), compared with $6.08 million ($0.27 per diluted share) a year ago. The higher net income was primarily driven by higher sales across all product lines, contributions from the acquisition of Xi'an Simo, and higher other income ($1.12 million in 1Q10 versus $0.54 million in 1Q09).

\*     \*     \*

Operating Income

Operating income totaled $27.73 million, compared with $8.03 million in 1Q09, representing a 246% year over year growth. Higher operating income was mainly due to increased sales and the acquisition of Xi'an Simo. Total operating costs including selling, general and administrative ("SG&A") expenses and research & development (R&D) expenses totaled $8.01 million, compared with $2.90 million a year ago. The higher operating costs were mainly due to the addition of Xi'an Simo, higher expenses related to higher sales such as shipping and handling costs, higher depreciation expense, and higher costs associated with the production start-up at our Shanghai facility. As a percentage of total sales, the Company's total operating costs decreased from 9.4% to 7.6%. Operating margin was relatively stable at 26.3% and 26.1% in 1Q10 and 1Q09, respectively.

"Despite a long Chinese new-year holiday, we maintained the momentum from the fourth quarter 2009 and delivered another set of strong results, thanks to the

-7-

hard work of our employees even during the traditional holiday season. While we are quite pleased to see the significant impact of our recent acquisition on all our revenues and profits, we are very satisfied with the progress made across all our existing business lines and in our international sales." said Mr. Yang, Chairman and Chief Executive Officer of Harbin Electric.

Outlook

"We believe that our business diversification efforts are paying off. We exited the quarter seeing continued strength in demand, setting us up nicely for the seasonally stronger second quarter. We are also encouraged by signs of stronger global economic activity, particularly in our North American market," commented Mr. Yang.

"We understand that some of our investors are concerned that the recent Chinese government efforts to cool down the real estate market and combat inflation might impact our business negatively. However, we believe that our business is a key foundation of China's overall economic growth and supports a wide range of economic sectors from agriculture to industry and manufacturing. Thanks to our diversification strategy, we do not expect a slowdown in the real estate sector in China to negatively impact our business. We continue to be very focused on restructuring our newly acquired Xi'an Simo business and improving manufacturing efficiency in Weihai. Our first quarter results reflect some early achievements in a very short period of time. We expect to expand on these positive results in the coming quarters."

20.    These results in turn came on the heels of record 4Q09 and FY09 results, as the Company disclosed in a March 10, 2010, press release entitled "Harbin Electric Reports Record Fourth Quarter and Full Year 2009 Results":

Harbin Electric, Inc. ("Harbin Electric" or the "Company"), a leading developer and manufacturer of a wide array of electric motors in the People's Republic of China , today reported its preliminary full-year and fourth quarter 2009 financial results. The Company will release fully audited financials in its 10K filing in the coming days and does not expect any material changes.

Fourth Quarter 2009 Financial Highlights

-- Total revenues were $107.2 million, up 209% from $34.7 million in 4Q08

-- Adjusted net income attributable to controlling interest (excluding non-recurring items) was $19.4 million, up 220% from $6.0 million in 4Q08

-- GAAP earnings attributable to controlling interest were $0.59 per diluted share, compared with $0.27 in 4Q08

-- Adjusted earnings attributable to controlling interest (excluding non-recurring items) were $0.62 per diluted share

Fiscal Year 2009 Financial Highlights

-- Total revenues were $223.2 million, up 85% from $120.8 million in 2008

-- Adjusted net income attributable to controlling interest (excluding non-recurring items) was $43.8 million, up 73% from $25.4 million in 2008

-- GAAP earnings attributable to controlling interest were $0.77 per diluted share, compared with $1.19 in 2008

-- Adjusted earnings attributable to controlling interest (excluding non-recurring items) were $1.71 per diluted share

\*       \*       \*

In the fourth quarter of 2009, total sales more than tripled to $107.2 million compared to $34.7 million in 4Q08, which was negatively impacted by the global financial crisis. The acquisition of Xi'an Tech Full Simo Electric Motor Co. Ltd. ("Xi'an Simo") in October 2009 contributed approximately $44 million in the fourth quarter. Excluding this acquisition, sales in the fourth quarter increased 82% year over year. The higher sales were primarily driven by increased sales in all product lines resulting from strong economic growth in China . The linear motor propulsion systems developed by the Company for coal transportation trains contributed $7.3 million to total sales as the Company started the delivery during the quarter and 116 oil pumps were sold in 4Q09, up from 31 units in 4Q08.

Net income attributable to controlling interest in the quarter totaled $18.3 million ($0.59 per diluted share), up from $6.0 million ($0.27 per diluted share) in 4Q08. Excluding the $1.04 million non-cash charge for the change in fair value of warrants, adjusted net income for 4Q09 was $19.4 million ($0.62 per diluted share). The following table presents the reconciliation of non-GAAP measure to GAAP net income for the quarter versus 4Q08.

\*       \*       \*

For the year 2009, revenues increased by 85% to $223.2 million from $120.8 million in 2008. Strong sales growth resulted from the acquisition of Xi'an Simo ($44 million) as well as higher sales across all product lines. The Company delivered 519 oil pumps compared to 214 units in 2008. Linear motor propulsion systems developed for coal transportation trains contributed $7.3 million to our sales as the Company started to deliver units during the 4th quarter.

Net income attributable to controlling interest in 2009 totaled $19.6 million ($0.77 per diluted share), which included $24.2 million charges related to non-recurring and non-cash items. Excluding these non-recurring items and non-cash charges, adjusted net income attributable to controlling interest for 2009 was $43.8 million ($1.71 per diluted share) compared to net income of $1.19 per diluted share in 2008. The following table presents the reconciliation of non-GAAP measure to GAAP net income for full-year 2009 versus 2008.

\*       \*       \*

Overall gross profit margin declined to 34.3% in 2009 from 39.3% in 2008 due to changes in the product mix as sales of lower-margin industrial rotary motors expanded, in part as a result of the acquisition of Xi'an Simo. Operating profits in 2009 were $55.8 million compared to $34.4 million in 2008.

"We are extremely pleased to have delivered the best quarter and the best year in our Company's history despite weak economic conditions early on," said Mr.

Tianfu Yang , Chairman and Chief Executive Officer of Harbin Electric. "2009 was also a year of great strategic, operational and financial accomplishments as we further strengthened our leadership position in the electric motor industry in China . The acquisition of Xi'an Simo, one of China's leading electric motor companies, and its successful integration allowed us to start realizing synergies and provided a solid platform for continuous growth. Faster economic growth in the second half of the year fueled by the massive government stimulus program created a positive environment for our business. On the financial front, we raised additional equity capital which allowed us to repay a significant portion of our existing indebtedness, complete the acquisition of Xi'an Simo, and maintain a strong balance sheet as we continue to implement our growth strategy. We view these record results, accomplished with the hard work and dedication of our employees, as well as the continuous support of our shareholders, as a validation of our vision, strategic focus and relentless execution."

Looking ahead, Mr. Yang commented, "We are ready to move the Company forward to a sustained profitability in 2010 supported by a solid platform that we have built over the past years as we expect continuous growth and leverage our strong financial position and promising portfolio of products. Although the first quarter is traditionally slower with the long Chinese new-year holiday, we do not expect this seasonality to impact our business significantly compared to the fourth quarter. We also expect that the Chinese government's commitment to sustainable economic growth and the accelerated industrialization and urbanization of China will continue to drive our business and support our long term growth objectives. We look forward to a productive 2010 as we continue to capture the synergies of the Xi'an Simo acquisition, advance R&D and strengthen growth in all core businesses. We believe that 2010 will be another strong year for Harbin Electric and we remain committed to our strategies to achieve both our near and long term goals and maximize value for our shareholders."

21.   These results in turn followed still other excellent results.  As a consequence, the Company's stock traded at nearly $25 per share in mid-2010, and analysts had target prices substantially higher than that.

## THE BUYOUT

22.   On October 11, 2010, Harbin's shareholders were dismayed when they learned that defendants had been diligently working to sell Harbin · to themselves. The Company issued a release entitled "Harbin Electric, Inc. Announces Receipt of 'Going Private' Proposal at $24.00 Per Share," which stated:

Harbin Electric, Inc. ("Harbin" or the "Company"), a leading developer and manufacturer of a wide array of electric motors in the People's Republic of China, today announced that its Board of Directors has received a proposal letter from its Chairman and Chief Executive Officer, Mr. Tianfu Yang ("Mr. Yang") and Baring Private Equity Asia Group Limited ("Baring") for Mr. Yang and an investment fund advised by Baring (the "Baring Fund") to acquire all of the outstanding shares of Common Stock of Harbin not currently owned by Mr. Yang and his affiliates in a going private transaction for $24.00 per share in cash, subject to certain conditions. Mr. Yang owns 31.1% of Harbin's Common Stock. According to the proposal letter,

an acquisition vehicle for the purpose of completing the acquisition will be formed and the acquisition is intended to be financed with a combination of debt and equity capital. The proposal letter states that the equity portion of the financing would be provided by Mr. Yang, the Baring Fund and related sources. The proposal letter also states that Goldman Sachs (Asia) LLC ("Goldman") is acting as financial advisor to the acquisition vehicle to be formed by Mr. Yang and the Baring Fund.

Harbin's Board of Directors has formed a special committee of independent directors consisting of David Gatton, Boyd Plowman and Ching Chuen Chan (the "Special Committee") to consider this proposal. The Special Committee intends to retain independent advisors, including an independent financial advisor, to assist it in its work. No decisions have been made by the Special Committee with respect to Harbin's response to the proposal. There can be no assurance that any definitive offer will be made, that any agreement will be executed or that this or any other transaction will be approved or consummated.

23.    The release was false and misleading as the defendants were aware that the so-called "Special Committee" was appointed for the sole purpose of immunizing defendants from liability for their unlawful conduct and the approval of a sale of Harbin to the Buyout Group was a *fait accompli*. Moreover, the $24 per share offered does not properly take into account the expected growth in earnings potential that the Company can expect from its assets and operations.

## DEFENDANTS FAILED TO MAXIMIZE SHAREHOLDER VALUE

24.    As a result of defendants' conduct, Harbin's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company. In order to meet their fiduciary duties, defendants are obligated to refrain from structuring a preferential deal for themselves.

25.    The process used to sell Harbin was defective and did not reflect the true inherent value of the Company, which far exceeds the $24 per share Buyout offer.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this action on his own behalf and as a class action on behalf of all holders of Harbin stock who are being and will be harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

27.    This action is properly maintainable as a class action.

28.    The Class is so numerous that joinder of all members is impracticable. According to Harbin's SEC filings, there were more than 31 million shares of Harbin common stock outstanding

- 11 -

1   as of August 6, 2010.

2       29.    There are questions of law and fact which are common to the Class and which

3   predominate over questions affecting any individual Class member. The common questions include,

4   *inter alia*, the following:

5           (a)    whether the Individual Defendants are breaching their fiduciary duties of

6   undivided loyalty, independence or due care with respect to plaintiff and the other members of the

7   Class in connection with the Buyout;

8           (b)    whether defendants are engaging in self-dealing in connection with the

9   Buyout;

10          (c)    whether defendants are unjustly enriching themselves and other insiders or

11  affiliates of Harbin;

12          (d)    whether the Individual Defendants are breaching any of their other fiduciary

13  duties to plaintiff and the other members of the Class in connection with the Buyout, including the

14  duties of good faith, diligence, honesty and fair dealing;

15          (e)    whether the Individual Defendants are breaching their fiduciary duties of

16  candor to plaintiff and the other members of the Class in connection with the Buyout by failing to

17  disclose all material information concerning the Buyout;

18          (f)    whether defendants, in bad faith and for improper motives, are impeding or

19  erecting barriers to discourage other offers for the Company or its assets;

20          (g)    whether the Buyout terms are unfair and inadequate to plaintiff and the Class;

21  and

22          (h)    whether plaintiff and the other members of the Class would be irreparably

23  harmed were the Buyout complained of herein consummated.

24      30.    Plaintiff's claims are typical of the claims of the other members of the Class and

25  plaintiff does not have any interests adverse to the Class.

26      31.    Plaintiff is an adequate representative of the Class, has retained competent counsel

27  experienced in litigation of this nature and will fairly and adequately protect the interests of the

28  Class.

32.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

33.   Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

34.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties Against
### the Individual Defendants

35.   Plaintiff repeats and realleges each allegation set forth herein.

36.   The Individual Defendants are knowingly or recklessly and in bad faith violating fiduciary duties of care, loyalty, good faith, candor and independence owed to the public shareholders of Harbin and have acted to put their personal interests ahead of the interests of Harbin shareholders.

37.   By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and as a part of a common plan, have acted knowingly or recklessly and in bad faith.

38.   The Individual Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by approving the Buyout without regard to the fairness of the transaction to Harbin shareholders and by failing to disclose all material information concerning the Buyout to such shareholders.

39.   As demonstrated by the allegations above, the Individual Defendants are knowingly or recklessly failing to exercise the care required, and breaching their duties of loyalty, good faith, candor and independence owed to the shareholders of Harbin because, among other reasons:

    (a)   they are taking steps to avoid competitive bidding, to cap the price of Harbin

1   stock and to give the Buyout Group an unfair advantage, by, among other things, failing to solicit

2   other potential acquirers or alternative transactions;

3           (b)    they are ignoring or are not protecting against the numerous conflicts of

4   interest resulting from the directors' own interrelationships or connection with the Buyout; and

5           (c)    they are failing to disclose all material information that would permit Harbin

6   stockholders to cast a fully informed vote on the Buyout, including both financial information and

7   regulatory information which may materially affect the Company and the Company's shareholders.

8       40.    Because the Individual Defendants dominate and control the business and corporate

9   affairs of Harbin, and are in possession of private corporate information concerning Harbin's assets,

10   business and future prospects, there exists an imbalance and disparity of knowledge and economic

11   power between them and the public shareholders of Harbin which makes it inherently unfair for

12   them to pursue any proposed transaction wherein they will reap disproportionate benefits to the

13   exclusion of maximizing stockholder value.

14       41.    By reason of the foregoing acts, practices and course of conduct, the Individual

15   Defendants are knowingly or recklessly and in bad faith failing to exercise ordinary care and

16   diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the

17   Class.

18       42.    Unless enjoined by this Court, the Individual Defendants will continue to knowingly

19   or recklessly and in bad faith breach their fiduciary duties owed to plaintiff and the Class, and may

20   consummate the proposed Buyout which will exclude the Class from its fair share of Harbin's

21   valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to

22   the irreparable harm of the Class.

23       43.    The Individual Defendants are engaging in self-dealing, are not acting in good faith

24   toward plaintiff and the other members of the Class, and knowingly or recklessly have breached and

25   are continuing to breach their fiduciary duties to the members of the Class.

26       44.    As a result of defendants' unlawful actions, plaintiff and the other members of the

27   Class are being harmed in that defendants will deprive plaintiff and the Class of a fair sale process.

28   Unless the proposed Buyout is enjoined by the Court, the Individual Defendants will continue to

- 14 -

knowingly or recklessly and in bad faith breach their fiduciary duties owed to plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Buyout terms, and will not supply to Harbin's minority stockholders sufficient information to enable them to cast informed votes on the proposed Buyout and may consummate the proposed Buyout, all to the irreparable harm of the members of the Class.

45.     Plaintiff and the members of the Class have an inadequate remedy at law.   Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

### Claim for Aiding and Abetting Breaches of Fiduciary Duty Against Harbin

46.     Plaintiff repeats and realleges each allegation set forth herein.

47.     Harbin aided and abetted the Individual Defendants in breaching their fiduciary duties owed to the public shareholders of Harbin, including plaintiff and the members of the Class.

48.     The Individual Defendants owed to plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

49.     By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiff and the members of the Class.

50.     Harbin colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and was an active and knowing participant in the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the members of the Class.

51.     Plaintiff and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in his favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Declaring and decreeing that any Buyout agreement entered into by the Company was

- 15 -

1  approved in breach of the fiduciary duties of defendants and is therefore unlawful and

2  unenforceable;

3         C.      Enjoining defendants, their agents, counsel, employees and all persons acting in

4  concert with them from consummating the Buyout, unless and until the Company adopts and

5  implements a fair sale process;

6         D.      Directing defendants to exercise their fiduciary duties to obtain a transaction which is

7  in the best interests of Harbin's shareholders;

8         E.      Rescinding, to the extent already implemented, the Buyout or any of the terms

9  thereof;

10        F.      Awarding plaintiff the costs and disbursements of this action, including reasonable

11 attorneys' and experts' fees; and

12        G.      Granting such other and further equitable relief as this Court may deem just and

13 proper.

14 DATED: October 22, 2010                THE O'MARA LAW FIRM, P.C.
                                          WILLIAM M. O'MARA
15                                        DAVID C. O'MARA

16

17                                        _____
                                                 DAVID C. O'MARA
18
                                          311 East Liberty Street
19                                        Reno, NV 89501
                                          Telephone: 775/323-1321
20                                        775/323-4082 (Fax)

21                                        ROBBINS GELLER RUDMAN
                                             & DOWD LLP
22                                        DARREN J. ROBBINS
                                          RANDALL J. BARON
23                                        A. RICK ATWOOD, JR.
                                          DAVID T. WISSBROECKER
24                                        DAVID A. KNOTTS
                                          EUN JIN LEE
25                                        655 West Broadway, Suite 1900
                                          San Diego, CA 92101
26                                        Telephone: 619/231-1058
                                          619/231-7423 (fax)

27

28

                                         - 16 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOLDFARB BRANHAM, LLP
HAMILTON LINDLEY
2501 North Harwood Street, Suite 1801
Dallas, TX 75201
Telephone: 214/583-2233
214/583-2234 (fax)

Attorneys for Plaintiff

S:\Cpt\Draft\Deal\Cpt Harbin Electric.doc

## AFFIRMATION
### (Pursuant to NRS 239B.030)

The undersigned does hereby affirm that the preceding document filed in the above-entitled matter

__X__        Document does not contain the social security number of any person

-OR-

___        Document contains the social security number of a person as required by:

_____ A specific state or federal law, to wit:

-or-

_____ For the administration of a public program

-or-

_____ For an application for a federal or state grant

-or-

_____ Confidential Family Court Information Sheet (NRS 125.130, NRS 125.230 and NRS 125B.055)

DATED:  October 22, 2010.

THE O'MARA LAW FIRM, PC

BY:_____
DAVID C. O'MARA, ESQ.

# EXHIBIT H

**F I L E D**
Electronically
10-28-2010:12:36:16 PM
Howard W. Conyers
Clerk of the Court
Transaction # 1814183

Dan C. Bowen, Esq.
Ann O. Hall, Esq.
BOWEN HALL
555 South Center Street
Reno, Nevada 89501
Telephone: (775) 323-8678

*Co-Counsel for Plaintiff Mark Rosen*

[Additional counsel appear on signature page.]

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

| | |
|---|---|
| Mark Rosen, on behalf of himself and all other similarly situated shareholders of Harbin Electric, Inc.<br><br>Plaintiff,<br><br>v.<br><br>TIANFU YANG, CHING CHUEN CHAN, BOYD PLOWMAN, DAVID GATTON, YUNYUE YE, LANXIANG GAO, HARBIN ELECTRIC, INC., AND BARING PRIVATE EQUITY ASIA GROUP LIMITED,<br><br>Defendants. | Case No. _____<br><br>Dept. No. _____<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**
**FOR BREACH OF FIDUCIARY DUTY**

Plaintiff Mark Rosen ("Plaintiff") on behalf of himself and all other similarly situated public shareholders of Harbin Electric, Inc. (hereafter, "Harbin" or the "Company") (the "Class"), by his attorneys, makes the following allegations against the members of the board of directors of Harbin (the "Harbin Board" or "Board") and Baring Private Equity Asia Group Limited ("Baring") in support of Plaintiff's claims relating to the proposed merger transaction described below. The allegations of this complaint are based on the personal knowledge of Plaintiff as to himself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters stated herein.

## INTRODUCTION

1.      This case arises due to Tianfu Yang ("Yang"), the Chairman, Chief Executive Officer ("CEO"), and largest and controlling stockholder of Harbin, use of his domination and control over the Company to covertly organize a going-private transaction with Baring that, if consummated, will cash-out the Company's minority shareholders for grossly inadequate consideration based on an inherently flawed sales process.

2.      Yang's 31% ownership stake, CEO title and the Company's corporate foundational documents - which do not provide for cumulative voting or allow public shareholders to call a special meeting – provide Yang with effective control over the Company.

3.      Yang used this control to conduct unilateral and secretive due diligence on the Company. For months, Yang funneled confidential information to his strategic partners, Baring and Goldman Sachs Asia LLC ("Goldman") in order to prepare and finance an acquisition of Harbin. During this time, the Harbin Board remained silent, never publicly disclosing that the Company was "in play" or taking any other steps to solicit competing offers to maximize value for its shareholders.

4.      By the time the Company disclosed on October 11, 2010 that Yang and Baring had made a proposal to acquire all outstanding shares of the Company's common stock not already owned by Yang for $24 a share (the "Proposed Transaction"), Yang was already off to an almost insurmountable "head start" over any other potential suitor.

-1-

5.     Yang's conduct in preparing and pursuing the Proposed Transaction is in direct conflict with his fiduciary duties as the Company's Chairman and CEO. Yang unquestionably has access to the Company's confidential financial and competitive information and is charged with using such information only to advance the interests of the Company and its public shareholders. Yang is legally forbidden to use such information for his personal gain at the direct expense of Harbin and the Class.

6.     Similarly, the Board's complacency during the months preceding the proposal constitutes its own breach of fiduciary duty to the Company and its public shareholders under Nevada law.

7.     In the event that Defendants do not cure these fiduciary breaches in response to the claims and allegations set forth herein, Plaintiff respectfully submits that the Proposed Transaction be enjoined and/or damages should be awarded to the proposed Class.

## JURISDICTION

8.     This Court has jurisdiction over all causes of action asserted herein pursuant to the Constitution of the State of Nevada, Article 6, section 6. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation or an individual who has sufficient minimum contacts with Nevada, to render the exercise of jurisdiction by the Nevada courts permissible under traditional notions of fair play and substantial justice. Harbin is a public corporation incorporated under the laws of the state of Nevada.

## THE PARTIES

9.     Plaintiff Mark Rosen is a shareholder of Harbin, has owned shares of Harbin common stock throughout the relevant time period, and will continue to hold shares through the pendency of this action.

10.     Defendant Harbin designs, develops, manufactures, supplies and services a range of electric motors, including linear motors, specialty micro-motors and industrial rotary motors. Harbin is incorporated under the laws of Nevada and maintains its headquarters at No. 9, Ha Ping Xi Lu, Ha Ping Lu Ji Zhong Qu, Harbin Kai Fa Qu, Harbin, China. The Company's common stock trades on NASDAQ under the ticker symbol "HRBN."

-2-

11.     Defendant Tianfu Yang has served as Harbin's Chairman and CEO since January 2005.  Since May 2003, Yang has been the Chairman and CEO of Harbin Tech Full Electric Co., Ltd.  From 2000 until the present, he has been the Chairman and CEO of Harbin Tech Full Industry Co., Ltd.  From 1994 to 2000, he was the President of Harbin Tianhong Wood Industry Manufacture Co., Ltd.  According to Yang's Schedule 13D/A filed on October 12, 2010, he owns 31.11% of the Company's outstanding shares.

12.     Defendant Ching Chuen Chan ("Chan") has served as a Company director since February 2005.

13.     Defendant Boyd Plowman ("Plowman") has served as a Company director since December 2009.

14.     Defendant David Gatton ("Gatton") has served as a Company director since February 2005.

15.     Defendant Yunyue Ye ("Ye") has served as a Company director since October 2006.

16.     Defendant Lanxiang Gao ("Gao") has served as a Company director since September 2008.  Gao joined the Company in September 2007 as Chief Operating Officer of Shanghai Tech Full Electric Co., Ltd., a wholly owned subsidiary of the Company.

17.     Defendant Baring is the largest regional growth equity firm in Asia with $2.5 billion under management.  Baring specializes in growth equity investments and mid-market buyouts targeting growth businesses that require capital for expansion, recapitalization or for M&A.  Primary investment markets include China, India, Japan, Singapore, Hong Kong, and Taiwan.  Baring is named as a defendant herein for aiding and abetting Yang's breaches of fiduciary duties.

18.     As directors of the Company, the defendants in paragraphs 11 through 16 above (collectively the "Individual Defendants") are in a fiduciary relationship with Harbin and its public shareholders, including Plaintiff, and owe the highest obligations of due care, good faith, loyalty and candor.  By virtue of their positions as directors and/or officers of Harbin and/or their exercise of control and ownership over the business and corporate affairs

-3-

of the Company, the Individual Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein. Each Individual Defendant owed and owes Harbin and its shareholders fiduciary obligations of candor, due care, good faith and loyalty and were and are required to: (a) use their ability to control and manage Harbin in a fair, just and equitable manner; (b) act in furtherance of the best interests of Harbin and its shareholders; (c) act to maximize shareholder value in connection with any change in ownership and control to the extent consistent with governing statutes; (d) refrain from abusing their positions of control; (e) not favor their own interests at the expense of the Company and its public shareholders; and (f) fully disclose the material circumstances, procedures, and terms of the Proposed Transaction so that shareholders can make a fully informed decision.

## SUBSTANTIVE ALLEGATIONS

**I.    YANG DOMINATES AND CONTOLS HARBIN AND THE HARBIN BOARD**

19.    Defendant Yang, Harbin's Chairman and CEO, owns 31.11% of the Company's outstanding common stock. Yang's large ownership stake, combined with the Company's decision not to provide for cumulative voting for directors, allows him to essentially determine the outcome of every director election.

20.    Yang's domination and control over Harbin is further enhanced by certain provisions in the Company's corporate foundational documents. For example, Harbin's Amended and Restated Bylaws (the "Bylaws") prohibit anybody, but members of the Board from calling a special meeting. The Bylaws state that:

> Special meetings of the shareholders of the Corporation for any purpose may be called at any time by the Board or, if the Directors in office constitute fewer than a quorum of the Board, by the affirmative vote of a majority of all the Directors in office, but such special meetings **may not be called by any other person or persons.** (Emphasis added.)

21.    This atypical bylaw provision deprives the Company's shareholders of an avenue to effectuate change in the event of a disagreement with Yang.

22.     Additionally, Harbin's Bylaws severely restrict the Company's public shareholders from taking action by written consent unless Yang approves of such action. The Bylaws provide that:

> Any action required or permitted to be taken at a meeting of the stockholders may be taken without a meeting if, before or after the action, a written consent thereto is signed by the stockholders holding at least a majority of the voting power.

23.     Because Yang owns approximately 31% of the Company's common stock, he only needs to garner support from 20% of the Company's public shareholders in order to stymie the ability of the shareholders to take action by written consent.

24.     Harbin's corporate foundational documents, coupled with Yang's lofty titles and substantial equity position, provide Yang with absolute and total control over the entirety of Harbin's corporate affairs and the Harbin Board.

25.     Yang's control over Harbin has not gone unnoticed by the investment community. Leading up to the Company's last annual meeting, respected proxy advisory firm Glass Lewis & Co. ("Glass Lewis") recommended that Harbin shareholders withhold votes for director Chan. Glass Lewis was disturbed that during Chan's tenure as chairman of the Company's nominating and corporate governance committee, he failed to demand that the Company appoint an independent chairman or at least an independent lead or presiding director. An independent chairman would be better able to oversee the executives of the Company and set a pro-shareholder agenda without management, and consequently, without conflicts that an executive insider or affiliated director face. Yang's iron grip over the Company makes such shareholder-friendly policies a non-starter.

II.     **YANG'S SECRETIVE DUE DILIGENCE AND THE HARBIN BOARD'S FAILURE TO TIMELY DISCLOSE THE EXPRESSION OF INTEREST**

26.     On October 11, 2010, Harbin announced that its Board had received a proposal from Yang and Baring to acquire all of the outstanding shares of common stock of the Company not currently owned by Yang in a going private transaction for $24.00 per share in

cash, a meager 20% premium to the Company's stock price on the trading day immediately preceding the announcement.

27.   That same day, Goldman issued a letter stating its preliminary indication of interest to potentially provide debt financing for the Proposed Transaction.

28.   Following receipt of the proposal, the Harbin Board formed a special committee of allegedly independent directors consisting of Defendants Chan, Plowman and Gatton (the "Special Committee") to consider the proposal.

29.   During the months leading up to the proposal, Yang used his controlling position to conduct unilateral and secretive due diligence on the Company. For months, Yang funneled confidential information to his strategic partners, Baring and Goldman in order to prepare and finance an acquisition of Harbin, and get ahead of any other potential bidders.

30.   As CEO and Chairman, Yang indisputably has access to material, non-public information concerning the Company's finances, prospects and potential. While he is charged with using this information to effectively run the Company's business and safeguard the interests of Harbin's shareholders, he may not use this information for personal gain.

31.   Yang is also leveraging his role on the Chinese National People's Congress (the "NPC"). The NPC is a forum for mediating policy differences between different parts of the Chinese Communist Party, the government, and social groups. The NPC has insight into legislature and investment decisions – insight that Yang plans to capitalize on after taking the Company private.

32.   By conducting secretive and unilateral due diligence in the months leading up to his $24 offer, Yang has provided himself a significant "head start" over any other potential suitor of Harbin.

33.   As it stands, any potential suitor of Harbin other than Yang must scramble to "catch-up" with him. In addition, other potential bidders understand that with the Harbin Chairman and CEO as their competition to acquire the Company, they will be unlikely to get cooperation or fulsome information from him when conducting their due diligence. This fact alone may dissuade interested parties, but certainly imposes a duty on the Harbin Board to

isolate Yang from any due diligence conducted by any other party, to provide that party with any and all information accessible to Yang, and other incentives to encourage potential bidders.

34.   The Harbin Board, therefore, is charged not only with just ensuring that all bona fide Harbin suitors have equal access to information, but also with communicating this fact to all relevant parties and providing additional incentives to potential bidders in light of Yang's status as CEO, Chairman and controlling shareholder.

35.   The fact that a competing bidder would be facing the prospect of buying a company where its CEO and Chairman would necessarily be on the opposite and losing side of a bidding war is dissuasive enough in its own right, but added to the factors described above, could completely undermine any prospect of maximizing shareholder value.

36.   Yang, aware of the value in keeping his due diligence a secret, breached his fiduciary duties to Harbin's shareholders by putting his personal interests ahead of that of the Company's public shareholders. Further, Yang and the Harbin Board have breached their duty of candor by failing to disclose Yang's initial indication of interest and commencement of due diligence.

III.   THE PROPOSED TRANSACTION OFFERS HARBIN'S PUBLIC SHAREHOLDERS WOEFULLY INADEQUATE CONSIDERATION

37.   The proposed merger consideration is grossly inadequate when examined under even minimal scrutiny. First, the premium offered in the Proposed Transaction is woefully insufficient for a target company with a trading history comparable to Harbin. As recently as March 10, 2010, the Company's stock was trading above the offer price, implying that the Proposed Transaction is actually a "take-under."

38.   Second, the proposed consideration fails to account for the explosive projected growth in demand for Harbin's products in China. As the Chinese economy industrializes and urbanizes, demand for electric motors for transportation, manufacturing, agriculture, energy exploration, and consumer applications is expected to grow faster than China's predicted 9-10% GDP growth over the next five years. In the near term, the Chinese government's

stimulus investment towards the under-developed rural areas will boost demand for agricultural and industrial machinery that uses a significant amount of Harbin's motor products. In particular, Harbin's unique expertise in higher-technology linear motors will help it gain market share in industrial automation applications and advanced electric trains.

39.     Moreover, the premium offered by Yang and Barings is illusory because they opportunistically made their offer before the Company's highest margin businesses (linear motors and automotive specialty micro-motors) have reached their full potential.   Linear motor sales will receive a large boost when the Company's motors for subway trains finish testing and begin production.  Similarly, automotive specialty micro-motor sales should receive a boost with the dramatic recovery currently underway among the North American auto part suppliers.

40.     The consideration offered in connection with the Proposed Transaction also fails to account for Harbin's exemplary financial performance in its most recently completed quarter. Some of the Company's financial highlights from the second quarter of 2010 include:

a)     Total revenues of $105.44 million, up 175% from $38.36 million the second quarter of 2009;

b)     Operating income totaling $28.08 million, up 219% from $8.82 million in the second quarter of 2009;

c)     Adjusted net income attributable to controlling interest of $24.02 million, up 224% compared to $7.42 million in the second quarter of 2009;

d)     GAAP earnings per diluted share attributable to controlling interest of $0.82, compared to a net loss of $0.24 in the second quarter of 2009; and

e)     Adjusted earnings per diluted share attributable to controlling interest of $0.77 per diluted share, compared to $0.33 in the second quarter of 2009.

41.     In the press release accompanying Harbin's 10-Q for the second quarter of 2010, Defendant Yang described the quarter as follows:

> We are very pleased with our outstanding second quarter earnings. Adjusted net income, by which we judge our management performance, was up 224% year-over-year at $24.02 million. We have made remarkable progress in the restructuring and integration of Xi'an Tech Full Simo Motor, which has led to a significant improvement in our operating efficiency. During this quarter, we restructured its subsidiaries, acquiring full ownership in four partially owned subsidiaries and disposing of non-strategic businesses. This brings us enhanced synergies across our diversified product lines and strengthens profit margins and earnings power. While our top line benefited from the acquisition of Xi'an Tech Full Simo Motor, earlier strategic moves continued to add to revenues. Weihai revenues were up 39% and oil pumps and coal transportation project performed strongly.

42. A glance at the trading multiples of Harbin's peers underscores the inadequacy of the proposed consideration. Chinese auto parts suppliers Sorl Auto Parts, Wonder Auto Technology, and China Automotive systems trade at 10x, 12x and 16x 2010 earnings per share ("EPS") estimates, respectively. The average of the three EPS multiples for Harbin's peers is 12.7x. Multiplying this by Harbin's expected $2.91 EPS for 2010, results in a valuation for the Company of $37, more than 50% higher than the proposed consideration.

43. Maxim Group analyst Echo He noted similar concerns regarding the proposed purchase price. He stated that the Company was undervalued at 6-7x its 2010 PE.

44. Harbin's public shareholders have a right to receive consideration that accurately accounts for the Company's stellar past performance and bright prospects for growth. However, the Proposed Transaction would cash out the Company's public shareholders at a woefully inadequate price.

45. Further, the Proposed Transaction does not account for the windfall Yang and Baring stand to make once they execute on their plan to list the Company on a Chinese stock exchange after they consummate the Proposed Transaction. With the Proposed Transaction, Yang and Baring have a highly undeniable arbitrage opportunity before them. For the underwhelming price of $24 per share, Yang and Baring plan to purchase the Company, and then list it anew on the fast evolving markets in China. Share prices in these markets suggest Harbin's equity will trade two to eight times higher than its present level. While Yang and

Baring will profit exorbitantly, Harbin's current public shareholders and other American investors will be denied value for the lucrative potential that the Company holds.

**CLASS ACTION ALLEGATIONS**

46.     Plaintiff brings this case on behalf of itself and as a class action, pursuant to Rule 23 of the Nevada Rules of Civil Procedure, on behalf of all holders of common stock of the Company, except defendants herein and their affiliates, who are threatened with injury arising from the Individual Defendants' actions as are described more fully herein.

47.     This action is properly maintainable as a class action.

48.     The Class is so numerous that joinder of all members is impracticable. The Company has thousands of shareholders who are scattered throughout the United States and the world. As of June 24, 2010, there were 31,067,471 shares of Harbin's common stock outstanding.

49.     There are questions of law and fact common to the Class including, *inter alia*, whether:

a)     The Individual Defendants breached their fiduciary duties of due care, good faith and loyalty with respect to Plaintiff and the other members of the Class as a result of the conduct alleged herein;

b)     The Proposed Transaction is entirely fair to the members of the Class;

c)     The process implemented and set forth by the defendants for the Proposed Transaction is entirely fair to the members of the Class;

d)     The Individual Defendants have breached their fiduciary duty of candor by failing to disclose all material facts related to the Proposed Transaction;

e)     Baring aided and abetted the Individual Defendants' breaches of fiduciary duties of candor, due care, good faith, and loyalty with respect to Plaintiff and the other members of the Class as a result of the conduct alleged herein; and

f)      Plaintiff and the other members of the Class would be irreparably harmed if Harbin, the Individual Defendants, and Baring are not enjoined from effectuating the conduct described herein.

50.     Plaintiff is committed to prosecuting the action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class. Plaintiff is an adequate representative of the Class.

51.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class, which would as a practical matter be disjunctive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

52.     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class, as a whole, is appropriate.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### AGAINST YANG AS CONTROLLING SHAREHOLDER

53.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

54.     As a controlling shareholder of Harbin, Yang owes the Class the utmost fiduciary duties of due care, good faith, and loyalty. Yang also owes the Class the duty to disclose all material facts regarding the Proposed Transaction.

55.     Yang stands on both sides of the Proposed Transaction because of his continuing role with the Company after the consummation of the going-private transaction.

56.     Yang must, but has not, acted in accordance with the stringent "entire fairness" standard in connection with the Proposed Transaction. Under this standard, Yang must (but

cannot) establish that the Proposed Transaction is the result of a fair process that returns a fair price for all Harbin shareholders. Yang and Baring's proposed merger consideration is inadequate and unfair, and Yang has dominated and controlled the Board's process, thus breaching his fiduciary duties.

57. Yang has failed to fulfill his fiduciary duties in the Proposed Transaction.

58. Plaintiff and the Class have been harmed by these breaches of fiduciary duty because the Proposed Transaction is not the result of a fair process and if, the Proposed Transaction is consummated, Plaintiff and the Class will not receive a fair price for their Harbin shares.

59. Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### BREACH OF FIDUCIARY DUTY
### AGAINST THE HARBIN BOARD

60. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

61. The Individual Defendants, as Harbin directors, owe the Class the utmost fiduciary duties of due care, good faith, candor and loyalty.

62. The Individual Defendants have breached those fiduciary duties by ceding control over the merger process to Yang and failing to publicly disclose that Yang had provided Baring and Goldman Sachs with due diligence materials.

63. The Individual Defendants are obligated by their fiduciary duties and the entire fairness standard to ensure that any merger transaction is accomplished by fair dealing and in a fair process that returns a fair price for all Harbin shareholders. The Individual Defendants have breached these duties.

64. Plaintiff has no adequate remedy at law.

## COUNT III

### AIDING AND ABETTIN A BREACH OF FIDUCIARY DUTY
### AGAINST BARING

-12-

65. Baring knew that Yang owes fiduciary duties to the Class, and knowingly worked with Yang to stealthily concoct a going-private transaction that would cash out Harbin's public shareholders for inadequate consideration.

66. Baring is liable for aiding and abetting Yang's breaches of fiduciary duty.

67. Plaintiff has no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

a) Declaring that this action is properly maintainable as a class action;

b) Declaring that Yang has breached his fiduciary duties to the Class;

c) Declaring that the Individual Defendants have breached their fiduciary duties to the Class;

d) Declaring that Baring has aided and abetted Yang's breaches of fiduciary duty.

e) Preliminarily and permanently enjoining Harbin and any of the Harbin Board members and any and all other employees, agents, or representatives of the Company and persons acting in concert with any one or more of any of the foregoing, during the pendency of this action, from taking any action to consummate the Proposed Transaction until such time as the Harbin Board has fully complied with their fiduciary duties and taken all readily available steps to maximize shareholder value, including but not limited to providing incentives to encourage other potential bidders and reframing from providing preclusive deal protections, such as matching rights, to Yang and Baring;

f) Requiring the Harbin Board to fully inform itself of and consider all of the Company's strategic alternatives;

g) Requiring the Defendants to fully and fairly disclose the terms of the Proposed Transaction and of efforts made by the Board to fully inform itself of possible alternatives to the Proposed Transaction;

-13-

h) Awarding the Class compensatory damages, together with pre- and post-judgment interest;

i) Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

j) Awarding such other and further relief as is just and equitable.

## AFFIRMATION

This document does not contain the social security number of any person.

Dated this 28th day of October, 2010.         BOWEN HALL

By: /s/ Ann O. Hall

Dan C. Bowen, Esq.
Ann O. Hall, Esq.
555 South Center Street
Reno, Nevada 89501
Telephone: (775) 323-8678

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
Mark Lebovitch, Esq. (Pro hac pending)
Amy Miller, Esq. (Pro hac pending)
Brett M. Middleton, Esq. (Pro hac pending)
Jeremy Friedman, Esq. (Pro hac pending)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Fax: (212) 554-1444

JOHNSON BOTTINI, LLP
Frank A. Bottini, Jr., Esq. (Pro hac pending)
501 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 230-0063
Fax: (619) 238-0622

*Counsel for Plaintiff Mark Rosen*

-14-