# EXHIBIT K

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NORFOLK COUNTY RETIREMENT SYSTEM,
individually and on behalf of all others similarly
situated,

               Plaintiff,

    - against -

TIANFU YANG and HARBIN ELECTRIC, INC,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. 10 - 35327

## CLASS ACTION COMPLAINT

Norfolk County Retirement System ("Plaintiff"), by and through its undersigned counsel,
for its Class Action Complaint, alleges upon personal knowledge with respect to it, and upon
information and belief based, *inter alia*, upon the investigation of counsel as to all other
allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a class action on behalf of the public shareholders of Harbin Electric, Inc.
("Harbin" or the "Company"). On October 11, 2010, the Company announced that its Board of
Directors (the "Board") had received a buy-out proposal from Baring Private Equity Asia Group
Ltd. (the "Baring Group"), and the Company's Chairman and Chief Executive Officer, Tianfu
Yang ("Yang"), who already owns more than 31% of the Company's stock. Yang and the
Baring Group offered to acquire all outstanding shares of the Company not already owned by
Yang for just $24 a share (the "Proposed Transaction"), despite the fact that analysts have valued
the Company at $33 per share and the Company has seen its sales skyrocket from just $40
million in 2006 to more than $223 million in 2009.

2.     By means of the Proposed Transaction, Yang seeks to leverage his unchallenged power over Company affairs to profit at the expense of the unaffiliated shareholders to whom he owes fiduciary responsibilities.  Accordingly, Plaintiff seeks injunctive and other appropriate relief relating to the Proposed Transaction.

## PARTIES

3.     Plaintiff Norfolk County Retirement System ("Norfolk") has over 9,500 active and retired members from 40 governmental units throughout the County of Norfolk, Massachusetts, and has approximately $500 million in assets under management. At all times relevant hereto, Norfolk has been and is a holder of Harbin common stock and has held such shares since prior to the wrongs complained of herein.

4.     Defendant Harbin is a corporation duly organized and existing under the laws of the state of Nevada and headquartered in Harbin, China.  Harbin is a foreign corporation authorized to transact business in New York and maintains its principal U.S. offices at 20 Ramblewood Road, Shoreham, NY 11786, located in the county of Suffolk.  Harbin's shares trade on the NASDAQ Global Select Market under the symbol "HRBN."  As of June 30, 2010, there were 31,067,471 shares of common stock outstanding.

5.     Defendant Yang has been the Chairman and Chief Executive Officer of Harbin since January 2005. In addition, Yang has been the Chairman and Chief Executive Officer of Harbin's subsidiaries, Harbin Tech Full Electric Co., Ltd. since 2003 and Harbin Tech Full Industry Co., Ltd. since 2000. Yang owns 31.1% of the common stock of the Company.  As a controlling shareholder of Harbin, Yang owes the Company's non-controlling shareholders fiduciary obligations of good faith, fair dealing, due care and full and fair disclosure.  On information and belief, Yang's address as Chairman and Chief Executive Officer of Harbin is 20

2

Ramblewood Road, Shoreham, NY 11786. Yang and Harbin are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

6.     In the event that the Proposed Transaction is not enjoined, the damages suffered and sought to be recovered by Plaintiff and the Class it seeks to represent are, in the aggregate, in excess of the jurisdictional minimum of this Court. Although the exact total amount of damages suffered by the Class members cannot be precisely determined at this time, it is reasonably estimated that such damages will be in the millions of dollars.

7.     Pursuant to CPLR 503(c), venue is proper in this Court because Harbin is a foreign corporation with its principal offices in this County. Furthermore, on information and belief, Yang's address of record is in Shoreham, New York, in Suffolk County.

## CLASS ACTION ALLEGATIONS

8.     Plaintiff brings this action pursuant to CPLR 901 *et seq.*, individually and on behalf of itself and all Harbin shareholders who are being and will be harmed by Defendants' actions described herein (the "Class"). The Class specifically excludes the Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with the Defendants.

9.     This action is properly maintainable as a class action.

10.    The Class is so numerous that joinder of all members is impracticable. As of June 30, 2010, there were 31,067,471 shares of common stock outstanding. Members of the Class are scattered throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

11.    Questions of law and fact exist that are common to the Class and predominate over questions affecting any individual Class member including, *inter alia*, the following:

a.      Whether Yang, as a controlling shareholder of Harbin, has breached the fiduciary duties he owes to Plaintiff and the Class in connection with the Proposed Transaction; and

b.      Whether Plaintiff and the other members of the Class will be irreparably damaged if Defendants' conduct complained of herein continues.

12.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

13.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not party to the adjudications or substantially impair or impede their ability to protect their interests. Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.

14.    Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

## SUBSTANTIVE ALLEGATIONS

A.   Company Background

15.    Harbin is a holding company that, through its subsidiaries, designs, develops, manufactures, supplies and services an array of electric motors. Its major product lines include

4

linear motors, automobile specialty micro-motors, and industrial rotary motors. The Company's products are purchased by companies in the oil services, factory automation, food processing, packaging, transportation, automobile, medical device, machinery and tool manufacturing, petrochemical, metallurgical and mining industries. The Company operates four manufacturing facilities, which are located in Shanghai, Xi'an, Weihai and Harbin, China, and employs approximately 2,200 people.

**B.    Yang Controls Harbin**

16.    Insofar as Yang owns 31% of the shares of the Company, his is overwhelmingly the dominant equity position in the Company. Further, according to a Form 10-K filed with the Securities and Exchange Commission on March 16, 2010, the Company acknowledges that its directors and officers collectively owned approximately 35.08% of the Company's issued and outstanding common stock as of December 31, 2009, affording them the "ability to significantly influence the outcome of all matters requiring stockholder approval, including... approval of significant corporate transaction such as mergers, consolidations or the sale of substantially all of our assets." *See* Form 10-K for the fiscal year ended December 31, 2009 (the "2009 10-K," incorporated herein by reference), at 15. The Company also stated that "[t]his concentration of ownership may have the effect of delaying or preventing a change of control, including a merger, consolidation or other business combination involving us, or discouraging a potential acquirer from making a tender offer or otherwise attempting to obtain control." *Id.* Accordingly, Yang, individually, and through the officers and directors he leads, is, by virtue of his controlling stake and position as CEO and Chairman, able to "take actions that may be adverse to [shareholders'] interests." *Id.*

5

C.   **Historical Growth**

17.   Over the past several years, the Company has aggressively sought to grow its business, pursuing its stated objective of becoming a global brand by acquiring and integrating into its pre-existing operations a steady stream of synergistically aligned companies.

18.   In July 2007, the Company acquired Harbin Taifu Auto Electric Co., Ltd., a manufacturer and supplier of electric motors for various automotive applications such as power seat adjusters, electronic sliding doors and power steerings to original equipment manufacturers ("OEMs").

19.   In July 2008, when the worldwide credit markets had already begun to collapse, a subsidiary of Harbin completed the acquisition of Weihai Hengda Electric Motor (Group) Co., Ltd. ("Hengda") for $54.7 million.   Hengda is a manufacturer and distributor of various industrial rotary motors such as high/low voltage motors, AC/DC motors and speed control motors.   By this acquisition, Harbin Electric expanded its product portfolio to include rotary motors.

20.   In October 2009, a wholly-owned subsidiary of Harbin paid $112 million in cash to acquire 87.2% of the stock and substantially all of the assets of Xi'an Simo Motor Incorporation (Group) ("Simo Motor").   Simo Motor is one of China's leading electric motor companies; it develops and manufactures industrial rotary motors and provides solutions for electrical driving systems.   By this acquisition, the Company expanded its industrial rotary motor business to encompass large, specialized types of rotary motors.

D.   **Harbin's Strong Business Prospects**

21.   In recent years, the Company's profits and overall success have skyrocketed.   In the years from 2006 through 2009, revenues at Harbin were $40.42 million, $65.4 million, $120.8 million and $223.23 million, respectively.   In the first quarter of 2010, the Company

recorded revenues of $105.49 million, up *243 percent* from $30.72 million in the first quarter of 2009. In the second quarter of 2010, the company recorded revenues of $105.44 million, up *175 percent* from $38.36 million in the second quarter of 2009. In addition, book value per share has risen steadily over the past four years, climbing from $2.71 in 2006 to $10.60 in 2009. As of June 30, 2010, the Company's book value per share was $11.97. As recently as March 10, 2010, the Company's stock reached $26.00.

22.    Yang is well aware of the Company's stellar performance. Indeed, in the Company's 2009 10-K, Yang stated, "We are extremely pleased to have delivered the best quarter and the best year in our Company's history despite weak economic conditions early on." Yang also observed that "[t]he acquisition of Xi'an Simo [Simo Motor], one of China's leading electric motor companies, and its successful integration allowed us to start realizing synergies and provided a solid platform for continuous growth." Yang has also proclaimed the Company's strong near and long term business prospects:

> We look forward to a productive 2010 as we continue to capture the synergies of the Xi'an Simo acquisition, advance R&D and strengthen growth in all core businesses. We believe that 2010 will be another strong year for Harbin Electric and we remain committed to our strategies to achieve both our near and long term goals and maximize value for our shareholders.

**E.    Yang Opportunistically Seeks to Acquire 100% Ownership of Harbin**

23.    On October 11, 2010, six years after the Company began to be traded on the NASDAQ Global Select Market and just as its revenues had begun to soar, the Company announced the Proposed Transaction. Pursuant to the terms of the offer, Harbin's shareholders would receive $24 for each share of Harbin common stock—which represents a 4 percent discount to Harbin's opening price of $24.98 on the very morning of the announcement.

24.    The press release issued by the Company stated, in pertinent part, as follows:

7

Harbin Electric, Inc. ("Harbin" or the "Company") (NASDAQ: HRBN), a leading developer and manufacturer of a wide array of electric motors in the People's Republic of China, today announced that its Board of Directors has received a proposal letter from its Chairman and Chief Executive Officer, Mr. Tianfu Yang ("Mr. Yang") and Baring Private Equity Asia Group Limited ("Baring") for Mr. Yang and an investment fund advised by Baring (the "Baring Fund") to acquire all of the outstanding shares of Common Stock of Harbin not currently owned by Mr. Yang and his affiliates in a going private transaction for $24.00 per share in cash, subject to certain conditions. Mr. Yang owns 31.1% of Harbin's Common Stock. According to the proposal letter, an acquisition vehicle for the purpose of completing the acquisition will be formed and the acquisition is intended to be financed with a combination of debt and equity capital. The proposal letter states that the equity portion of the financing would be provided by Mr. Yang, the Baring Fund and related sources. The proposal letter also states that Goldman Sachs (Asia) LLC ("Goldman") is acting as financial advisor to the acquisition vehicle to be formed by Mr. Yang and the Baring Fund.

25.    The terms of the Proposed Transaction were not the result of an auction process or active market check—the terms were arrived at without a full and thorough investigation of strategic alternatives, and they are intrinsically unfair and inadequate from the standpoint of Harbin's non-controlling shareholders.

26.    In setting the terms of the Proposed Transaction, Yang—who owns approximately 31 percent of the voting rights associated with Harbin's common stock—has placed his own interests above the interests of the members of the Class and has therefore breached his fiduciary duties.

27.    The Proposed Transaction lacks any of the fundamental hallmarks of fairness. Approval of the Proposed Transaction is effectively a foregone conclusion, because Yang controls 31 percent of the Company's common stock.

28.    The Proposed Transaction is financially unfair. The consideration to be paid to Class members is unfair and inadequate because, among other things: (a) the intrinsic value of

8

the stock of the Company is materially in excess of $24 per share, giving due consideration to the prospects for growth and profitability of the Company in light of its revenues and earning power, present and future; and (b) the offer price is an inadequate premium to the public shareholders of Harbin. Indeed, as recently as March 10, 2010, Harbin common stock traded at $26 per share.

29.    On October 11, 2010, the day that the Proposed Transaction was announced, the market immediately reacted to Yang's inadequate offer by surging ahead of the Proposed Transaction price in intraday trading to $25.05.

30.    Although Yang is intent on paying an unfairly low price to Plaintiff and the Class, he is duty-bound to maximize shareholder value.  Yang has clear and material conflicts of interest and is acting to better his own interests at the expense of Harbin's public shareholders. Among other things, Yang essentially controls the Company and its proxy machinery.

31.    Because Yang owns 31 percent of the Company's stock, he has the coercive power to influence any vote of non-controlling shareholders.  As such, a third party bid for the Company is highly unlikely to succeed as a practical matter, because the success of such a bid would essentially require the consent and cooperation of Yang.  Thus, Yang will be able to proceed with the Proposed Transaction without an auction or other type of market check to maximize value for the Company's public shareholders.  Further, no approval process can be considered fair and, thus, any "independent" approval process is but an illusory protection to Harbin's shareholders.

32.    The stock value that Yang has offered has been dictated by Yang to serve his own interests, and it is being crammed down by Yang to force Harbin's shareholders to relinquish their Harbin shares at a grossly unfair price.  Such action constitutes unfair dealing.

9

33.   Because Yang is in possession of proprietary corporate information concerning Harbin's future financial prospects, the degree of knowledge and economic power between Yang and the Class is unequal, making it grossly and inherently unfair for Yang to obtain the remaining Harbin shares at the unfair and inadequate price offered.

34.   Indeed, on October 11, 2010, the day of the announcement of the Proposed Transaction, analysts at Roth Capital Partners, LLC set a 12-month target price for Harbin common stock of $33 per share. This would represent a 38% premium over the $24 per share offer price in the Proposed Transaction.

35.   An acquisition by Yang of the public shares of Harbin is subject to the exacting entire fairness standard, under which Yang must establish fair dealing and a fair price. Unless the Court enjoins the Proposed Transaction, Yang will engage in further breaches of his fiduciary duties to the Company's shareholders and these actions will result in irreparable harm to the members of the Class.

## COUNT I

### Breach of Fiduciary Duty
### (Against Yang)

36.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

37.   By virtue of his substantial stock ownership and his positions as CEO and Chairman of the Company, Yang is a controlling shareholder of Harbin.

38.   As a controlling shareholder, Yang stands in a fiduciary relationship to unaffiliated shareholders such as Plaintiff and the Class and owes fiduciary responsibilities to them, including, *inter alia*, duties of utmost good faith, loyalty and care.

39.   By offering grossly inadequate value for Harbin's shares, Yang is violating his duties as a controlling shareholder.

40.     Any buyout of Harbin's public shareholders by Yang on the terms announced will deny Class members their right to share proportionately and equitably in the true value of Harbin's valuable and profitable business and future growth in profits and earnings at a time when the Company is poised to increase its profitability.

41.     Yang's fiduciary obligations under these circumstances require him to:

        a.      act independently so that the interests of Harbin's public stockholders will be protected;

        b.      adequately insure that no conflicts of interest exist between his own interests and his fiduciary obligation of entire fairness, and if such conflicts exist, to ensure that all the conflicts are resolved in the best interests of Harbin's public shareholders; and

        c.      not use his influence as controlling shareholder to the detriment of the non-controlling shareholders.

42.     By reason of the foregoing, Yang has breached and will continue to breach his duties to the non-controlling shareholders of Harbin and is engaging in improper, unfair dealing and wrongful and coercive conduct, and has acted to put his personal interests ahead of the interests of Harbin's non-controlling shareholders.

43.     As demonstrated by the allegations above, Yang has failed to exercise the care required and has breached his duties of loyalty, good faith, care, candor and independence owed to the shareholders of Harbin because, among other reasons:

        a.      Yang failed to properly value Harbin and its various assets and operations; and

        b.      Yang has ignored or failed to protect the non-controlling shareholders against his influence in connection with the Proposed Transaction.

44.   The damages which will be suffered by Plaintiff and the Class should the Proposed Transaction be consummated will be proximately caused by Yang's breaches of fiduciary duty.

## COUNT II

### For Injunctive Relief
### (Against Yang and Harbin)

45.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

46.   By the acts, transactions and courses of conduct alleged herein, Yang, in breach of his fiduciary duties of loyalty, good faith and due care to Plaintiff and the other members of the Class, has failed to offer a price representing the true value of the Company and, by consummating the Proposed Transaction, will unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Harbin.

47.   Unless enjoined by this Court, Yang will continue to breach his fiduciary duties owed to Plaintiff and the Class, and, in conjunction with Harbin, may consummate the Proposed Transaction on unfair and inadequate terms, which will exclude the Class from its fair, proportionate share of Harbin's valuable assets and businesses, subjecting the Class to irreparable harm for which there is no adequate remedy at law.  Only through the exercise of the Court's equitable powers can Plaintiff and the Class be fully protected from immediate and irreparable injury which Yang and Harbin's actions threaten to inflict.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.   Declaring that this action may be maintained as a class action and certifying Plaintiff as the Class Representative and Plaintiff's counsel as Class Counsel and Liaison Counsel;

B.      Preliminarily and permanently enjoining Defendants Yang and Harbin and all persons acting in concert with them, from proceeding with, consummating, or closing the Proposed Transaction;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside, and awarding, *inter alia*, rescissory damages against Yang to Plaintiff and the Class;

D.      Directing Yang to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.      Awarding compensatory damages against Yang in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

F.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' fees and expenses, including experts' fees; and

G.      Granting such other and further relief as this Court may deem just and equitable, including all injunctive relief as alleged heretofore.

Dated:  October 15, 2010                    Respectfully submitted,

Scott Fisher
**JASPAN SCHLESINGER LLP**
300 Garden City Plaza
Garden City, New York  11530
Telephone: (516) 746-8000
Facsimile: (516) 393-8282

*Liaison Counsel for Plaintiff Norfolk County*
*Retirement System and Proposed Class*
*Liaison Counsel*

13

Christopher J. Keller
Michael W. Stocker
Matthew C. Moehlman
Yoko Goto
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Norfolk County Retirement
System and Proposed Class Counsel*

D#727379

14

# EXHIBIT L

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

| | |
|---|---|
| GEORGE YUN, on behalf of himself and all others similarly situated, <br><br>                  Plaintiff, <br><br>              v. <br><br>HARBIN ELECTRIC, INC., TIANFU YANG, CHING CHUENG CHAN, BOYD PLOWMAN, DAVID GATTOM, YUNYUE YE, and LANXIANG GAO, <br><br>                  Defendants. | Civil Action No. _____ <br><br>FILED <br><br>OCT 22 2010 <br><br>JUDITH A. PASCALE <br>CLERK OF SUFFOLK |

## CLASS ACTION COMPLAINT

Plaintiff alleges the following upon information and belief except for those allegations which pertain to plaintiff, which allegations are based upon personal knowledge:

1.    Plaintiff brings this action on behalf of himself and all other public shareholders of Harbin Electric, Inc. ("Harbin" or the "Company") who are threatened with the deprivation of the value of their shares of Harbin common stock.

2.    This action seeks, *inter alia*, to enjoin the Company's Chief Executive Officer and Chairman of the Board of Directors, Tianfu Yang ("Yang"), together with an investment fund advised by Baring Private Equity Asia Group Limited (the "Baring Fund"), from acquiring all the shares of Harbin stock that Yang and his affiliates currently do not own for the grossly inadequate consideration of $24.00 per share in cash, in breach of Yang's fiduciary duties (the "Proposed Transaction" or the "Proposal"). Yang already owns approximately 31.1% of

Harbin's common stock. Plaintiff also seeks rescission, rescissory damages, or compensatory damages in the event the Proposed Transaction is consummated.

## THE PARTIES

3.   Plaintiff George Yun is, and at all relevant times was, the owner of 22,000 shares of Harbin stock.

4.   Defendant Harbin is a Nevada corporation with its headquarters located at No. 9 Ha Ping Xi Lu, Ha Ping Lu Ji Zhong Qu, Harbin Kai Fa Qu, Harbin, People's Republic of China, 150060. The Company's registered agent is The Corporation Trust Company of Nevada, located at 311 S. Division Street, Carson City, Nevada 89703. Harbin's United States offices are located at 20 Ramblewood Road, Shoreham, New York 11786. Harbin common stock is, and at all times relevant hereto was, listed and traded on the Nasdaq under the symbol "HRBN." Harbin is a developer and manufacturer of a wide array of electric motors with a focus on innovative, customized and value-added products. According to the Company's Form 10K for 2010 filed with the U.S. Securities and Exchange Commission ("SEC"), Harbin's major product lines include linear motors, automobile specialty micro-motors, and industrial rotary motors. The Company's products are purchased by a broad range of domestic and international customers, including companies in the oil services, factory automation, food processing, packaging, transportation, automobile, medical devices, machinery and tool manufacturing, petrochemical, as well as in the metallurgical and mining industries. The Company operates four manufacturing facilities in China located in Xi'an, Weihai, Harbin, and Shanghai. Harbin has developed award-winning products for its customers and owns numerous patents in China, including twenty patents related to their linear motors and automobile specialty micro-motors products.

2

5.    According to Harbin's most recent annual proxy statement filed with the SEC and posted on the Company's website, Defendant Yang has served as the Chairman of Harbin's Board of Directors (the "Board") and Chief Executive Officer ("CEO") since January 2005. Yang has also served as Chairman and CEO of Harbin Tech Full Electric Co., Ltd. since May 2003, and has been the Chairman and CEO of Harbin Tech Full Industry Co., Ltd. since 2000. He is also the largest shareholder of Harbin and beneficially owns approximately 31.1% of the Company's common stock.

6.    Because of his positions as Chairman, CEO, and as the largest shareholder of the Company, Yang qualifies as the controlling shareholder of Harbin. As the controlling shareholder of the Company, Yang owes a fiduciary duty to the Company's public shareholders not to use his controlling position to wrongfully benefit himself at the expense of the Company's public shareholders. Because Yang is in a fiduciary relationship with plaintiff and the other public shareholders of Harbin, he owes plaintiff and Harbin's other shareholders the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure.

7.    Defendant Ching Chuen Chan ("Chan") is, and has been, a director of the Company since February 2005. Chan is also a member of Harbin's Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee.

8.    Defendant Boyd Plowman ("Plowman") is, and has been, a director of the Company since December 2009. Plowman is also a member of Harbin's Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee.

9.    Defendant David Gatton ("Gatton") is, and has been, a director of the Company since February 2005. Gatton is also a member of Harbin's Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee.

10.    Defendant Yunyue Ye ("Ye") is, and has been, a director of the Company since October 2006.

11.    Defendant Lanxiang Gao ("Gao") is, and has been, a director of the Company since September 2008.  According to the Company's 10K for 2010, Gao is not an independent director.

12.    Defendants Yang, Chah, Plowman, Gatton, Ye and Gao are collectively referred to herein as the "Individual Defendants."  By reason of their positions as officers and/or directors of the Company, the Individual Defendants are in a fiduciary relationship with plaintiff and the other public shareholders of Harbin, and owe plaintiff and Harbin's other shareholders the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure.

13.    The Individual Defendants, together with Harbin's Vice President, Chief Financial Officer, and Executive Vice President of Finance and Investor Relations and Corporate Secretary, as a group control 35.2% of the Company's common stock.

## CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action, pursuant to Rule 901 of the C.P.L.R., on behalf of all public stockholders of the Company (except the defendants herein and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the defendants) and their successors in interest, who are or will be threatened with injury arising from defendants' actions as more fully described herein (the "Class").

15.    This action is properly maintainable as a class action for the following reasons:

        (a)    the Class is so numerous that joinder of all members is impracticable.  As of August 6, 2010, there were approximately 31,067,471 shares of common stock outstanding,

approximately 20 million of which are in the hands of public shareholders. Harbin is listed and actively traded on the Nasdaq under the ticker symbol "HRBN";

       (b)    there are questions of law and fact which are common to members of the Class, including, *inter alia*, the following:

       (i)    whether Yang engaged in, and is continuing to engage in, a plan and scheme to benefit himself at the expense of plaintiff and other members of the Class;

       (ii)    whether Yang has breached his fiduciary duties owed to plaintiff and the other members of the Class, including his duties of loyalty, due care, and candor;

       (iii)    whether the Individual Defendants have breached their fiduciary duties owed to plaintiff and the other members of the Class;

       (iv)    whether the Individual Defendants have acted or are capable of acting so as to protect the public shareholders from overreaching by Yang;

       (v)    whether plaintiff and the other members of the Class would be irreparably damaged were Yang not enjoined from the conduct complained of herein;

       (c)    the claims of plaintiff are typical of the claims of the other members of the Class, and plaintiff has no interests that are adverse or antagonistic to the interests of the Class; and

       (d)    plaintiff is committed to prosecuting this action and has retained counsel competent and experienced in litigation of this nature. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

16.    Defendants have acted in a manner which affects plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

17.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

<u>SUBSTANTIVE ALLEGATIONS</u>

**<u>Background</u>**

18.    As reported in Harbin's 10Q filed with the SEC on August 9, 2010, the Company's total revenues spiked 175% to $105.44 million compared to $38.36 million in the second quarter of 2009, which had been negatively impacted by the global financial crisis.  The significant sales growth resulted primarily from higher sales across all product lines and a contribution of $44.57 million from the acquisition of Xi'an Tech Full Simo in October 2009. Harbin's adjusted net income also increased 224% to $24.02 million, mainly as a result of higher sales across all product lines, contributions from Xi'an Tech Full Simo, and higher other income. In a press release accompanying the August 9, 2010 10Q, Yang explained the Company's performance:

> We are very pleased with our outstanding second quarter earnings.  Adjusted net income, by which we judge our management performance, was up 224% year-over-year at $24.02 million. We have made remarkable progress in the restructuring and integration of Xi'an Tech Full Simo Motor, which has led to a significant improvement in our operating efficiency. During this quarter, we restructured its subsidiaries, acquiring full ownership

in four partially owned subsidiaries and disposing of non-strategic businesses. This brings us enhanced synergies across our diversified product lines and strengthens profit margins and earnings power. While our top line benefited from the acquisition of Xi'an Tech Full Simo Motor, earlier strategic moves continued to add to revenues. Weihai revenues were up 39% and oil pumps and coal transportation project performed strongly.

19.     While Harbin acknowledged its business could decline if China's economy weakens, it has been reported that Harbin's prospects look promising, especially considering that the Company has next-generation motors that will be essential for China's growing economy.  In this connection, Yang explained:

Despite concerns about the slowing down of the Chinese economy, we continue to see strong demand for many of our products. As we expect continued strong order volume for our rotary motors, our focus in the months ahead is to address production capacity constraints at our Weihai and Xi'an facilities. In our specialty motor lines including linear motors and specialty micro-motors, where speed of product development and market launch is the key to future growth, we have made substantial capital investments. We believe that capacity expansion and the expected and long-awaited launch of new products, coupled with our success in business integration, restructuring, and consolidation, will help us further extend our leadership position in the industry.

20.     As one financial commentator noted, Harbin has achieved these high level of sales and net income without their highest margin businesses (linear motors and automotive specialty micro-motors) reaching close to full potential.  In addition, linear motor sales are expected to receive a large boost when the Company's motors for subway trains finish testing and begin production, and sales of automotive specialty micro-motors should receive a boost with the recovery underway among the North American auto parts suppliers.  The commentator further noted that when production of linear motors for subway trains begin, the fact that Harbin has the only domestically produced linear motor technology for subway trains will bring the Company an even higher profile.

21.     On October 17, 2010, TheStreet Ratings reported that Harbin's "very impressive revenue growth greatly exceeded the industry average of 1.3%" and that the Company's stock has

"clearly outperformed" the rise in the S&P 500 over the past year. It also noted that compared to other companies in the electrical equipment industry and the overall market, Harbin's return on equity exceeds the industry average and the S&P 500. The fact that Harbin's current return on equity exceeded its return on equity from the same quarter one year prior "is a clear sign of strength within the company." TheStreet Ratings concluded that, "[l]ooking ahead, unless broad bear market conditions prevail, we still see more upside potential for this stock, despite the fact that it has already risen over the past year."

The Proposed Transaction

22.     On October 11, 2010, Harbin issued a press release, announcing that its Board had received a proposal for a going private transaction from Yang and Baring Private Equity Asia Group Limited ("Baring") for Yang and the Baring Fund "to acquire all of the outstanding shares of Common Stock of Harbin not currently owned by Mr. Yang and his affiliates in a going private transaction for $24.00 per share in cash."

23.     The press release states, in pertinent part:

According to the proposal letter, an acquisition vehicle for the purpose of completing the acquisition will be formed and the acquisition is intended to be financed with a combination of debt and equity capital. The proposal letter states that the equity portion of the financing would be provided by Mr. Yang, the Baring Fund and related sources. The proposal letter also states that Goldman Sachs (Asia) LLC ("Goldman") is acting as financial advisor to the acquisition vehicle to be formed by Mr. Yang and the Baring Fund.

24.     Although the proposed offer price of $24.00 per share by Yang represents a 20% premium to Harbin's common stock closing price of $19.96 on October 8, 2010, the business day prior to the announcement of the Proposed Transaction, the Company's common stock has traded above the offer price at as high as $26.00 per share in intraday trading on March 10, 2010, and $25.05 in intraday trading on October 11, 2010, the day of Harbin's announcement that its Board

had received the Proposal. In addition, the Proposed Transaction price represents a negative premium to Harbin's 52-week high trading price of $24.28 per share on January 8, 2010, as well as the closing price of $24.21 on March 10, 2010.

25.    Further indicating that the Proposed Transaction price is inadequate, analysts have predicted target prices in excess of the $24 offered by Yang. For example, on October 13, 2010, an Oscar Gruss & Son Inc. analyst forecasted a target price of $28.50 per share for Harbin common stock and an analyst from Roth Capital Partners predicted a target price of $26.00 per share, and on October 17, 2010, TheStreet Ratings forecasted a target price of $27.82 per share. In addition, on October 19, 2010, an analyst forecasted a target price of $33.00 per share and on October 4, 2010 a target price of $28.33 per share was also reported. Furthermore, as noted by a financial commentator on October 12, 2010, taking into consideration Harbin's expected 2011 earnings, the upside potential from higher margin subway motors and specialty micro-motors, and considering the Company's potential for further multiple expansion, Harbin's target price could reach well over $40 per share.

26.    The Proposed Transaction is being pursued so as to enable defendant Yang and the Baring Fund to acquire 100% equity ownership of the Company for their own benefit at the expense of the Company's public stockholders who will be deprived of their equity investment and the benefits thereof including, among other things, the Company's future financial prospects. By failing to consider any sale or merger of Harbin, selling his shares to any third party, or entering into discussions with any other financial sponsor for a similar transaction, Yang is preventing Harbin shareholders from receiving the highest price possible for their shares. Yang has timed his Proposed Transaction to place an artificial cap on the trading price of the Company's stock at a time when it is poised for significant growth due to the "expected and

long-awaited launch of new products" that will be essential for China's growing economy.  In addition, the U.S. economy is improving and the Company's business integration, restructuring and consolidation have started to show signs of success.  Thus, Yang is attempting to buy out the public stockholders of the Company at an unfair price, dramatically below the underlying and real value of the Company, in the Proposed Transaction that is the result of a process in which Yang is at an informational advantage to the Company's public shareholders.  The interests of the Company's public shareholders must, therefore, be protected from overreaching by the Company's controlling shareholder.

27.     As mentioned above, Yang has an edge in any transaction in which he proposes to purchase the public shares of the Company by virtue of his access to, and knowledge of, Harbin's non-public information.  In addition, because the other Individual Defendants are beholden to Yang, as described below, and cannot be expected to review the Proposed Transaction fairly, this Court must review any transaction concerning Yang with enhanced scrutiny.

28.     The independence of the Individual Defendants other than Yang is in serious doubt since said Board members are indebted to Yang for their positions on the Board because of his ownership of 31.1% of the Company and his presence as Chairman of the Board of Directors.  As such, Yang is in a position to dominate and control the other directors.

COUNT I

Claim for Breaches of Fiduciary Duties<br>Against Yang and the Individual Defendants

29.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

30.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, as officers and/or directors of the Company, and Yang, as controlling shareholder,

10

have violated their fiduciary duties of good faith, loyalty, and due care at the expense of plaintiff and other members of the Class.

31.    The Proposed Transaction was offered in bad faith to cap the market price for the Company's stock, and dissuade other potential bidders from entering into the fray. The consideration to be paid to Class members as offered in the Proposed Transaction is unconscionable and unfair and so grossly inadequate as to constitute a gross breach of trust committed by Yang against the public stockholders because, among other things:

a)    The Company's intrinsic value, giving due consideration to its growth and profitability, and the underlying strength of its business is significantly greater than the offering price;

b)    Yang has undervalued the Company's common stock by ignoring the full value of its future prospects, and is attempting to take the Company private at a time when it is about to reap the benefits of the launch of its highly anticipated new products, as well as its successful business integration, restructuring and consolidation. The Proposed Transaction does not reflect the true financial position of the Company given that Harbin is poised for significant growth;

c)    Yang has timed the announcement of the Proposed Transaction to place an artificial lid or cap on the market price for the Company's stock to enable Yang to acquire the minority stock at the lowest possible price.

32.    Unless Yang and the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to plaintiff and the other members of the Class, and will further a process that allows Yang and the Baring Fund to purchase the public shares of the Company for inadequate consideration.

11

33.    Absent injunctive relief, plaintiff and the Class will continue to suffer irreparable harm as a result of Yang's and the Individual Defendants' breaches of fiduciary duty, for which plaintiff and the Class have no adequate remedy at law.

WHEREFORE, plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the defendants, as follows:

1.    Declaring that this action is properly maintainable as a class action, certifying plaintiff as Class representative, and certifying his counsel as Class counsel;

2.    Preliminarily and permanently enjoining defendants and all those acting in concert with them, from proceeding with the Proposed Transaction unless and until such time as Yang and the Individual Defendants have acted in accordance with their fiduciary duties toward the Company's public shareholders;

3.    In the event the Proposed Transaction is consummated prior to this Court's final judgment, rescinding it and setting it aside or awarding rescissory damages;

4.    Directing Yang and the Individual Defendants to account to plaintiff and the Class for all damages suffered by them as a result of Yang's and the Individual Defendants' wrongful conduct if the Proposed Transaction is consummated;

5.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

6.      Granting such other and further equitable relief as this Court may deem just

and proper.

WOLF POPPER LLP

By:      *[signature]*
Robert M. Kornreich
Chet B. Waldman
Sheryl H. Altwerger
845 Third Avenue
New York, New York 10022
(212) 759-4600

*Attorneys for Plaintiff*

13

# EXHIBIT M

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
COMMERCIAL DIVISION
-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- x

GERALD G. GOULD, individually and on behalf of
all others similarly situated,

                      Plaintiff,

        - against -

TIANFU YANG

                  Defendant.

Index No. 10/26/10
Date Filed: 10/40004

The basis of venue is Defendant's
company's principal place of business

Plaintiff designates Suffolk County as
the place of trial

To the above-named defendant:

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and
to serve a copy of our answer, of the complaint, if it is not served with the summons, to
serve a notice of appearance on the plaintiff's attorney with twenty (20) days after the
service of the summons, exclusive of the day of service of this summons, or within thirty
(30) days after service of this summons is complete if this summons is not personally
delivered to you within the State of New York; and in case of your failure to answer this
summons, a judgment by default will be taken against you for the relief demanded in the
complaint, together with the costs of this action.

      Plaintiff hereby demands a trial by jury.

DATED:  October 25, 2010

Respectfully submitted,

David A.P. Brower
**BROWER PIVEN**
 A Professional Corporation
488 Madison Avenue
Eighth Floor
New York, NY  10022
Tel:  212-501-9000
Fax: 212-501-0030
*Counsel for Plaintiffs*

OF COUNSEL:

**FINKELSTEIN THOMPSON LLP**
Donald J. Enright
Elizabeth K. Tripodi
Rosalee B. Connell
1050 30th Street, NW
Washington, D.C. 20007
Tel.: (202) 337-8000
Fax: (202) 337-8090

*Counsel for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
COMMERCIAL DIVISION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GERALD G. GOULD, individually and on behalf of
all others similarly situated,

                       Plaintiff,

            - against -

TIANFU YANG

                    Defendant.

Index No.

**CLASS ACTION COMPLAINT**

    Plaintiff ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges upon information and belief, except as to the allegations which pertain to Plaintiff, which allegations are based upon personal knowledge, as follows:

## NATURE OF THE ACTION

    1.    This is a shareholder class action brought by Plaintiff on behalf of the public shareholders of Harbin Electric, Inc. ("Harbin" or the "Company") against Defendant Tianfu Yang ("Yang" or "Defendant"), seeking injunctive and other relief for his breach of fiduciary duty.

    2.    On October 11, 2010, Harbin announced a merger pursuant to which Defendant Tianfu Yang ("Yang") and an investment fund advised by Baring Private Equity Asia Group Limited ("BPEAGL") would acquire the Company for $24 per share

in cash in a deal valued at approximately $752.2 million (the "Proposed Transaction"). The Proposed Transaction, however, inadequately values Harbin, and at least one analyst was quoted on Yahoo! Finance as setting a target price of $33 for Harbin stock.

3.      Defendant's proposal, for the Company to be taken private by Defendant Yang and BPEAGL, offers an unfair price. As alleged in greater detail *infra*, Defendant Yang, the owner of 31.1% of the Company's stock and its Chief Executive Officer and Chairman of its Board of Directors, has a dominating interest in the Company allowing him to exert substantial control, and stands on both sides of the Proposed Transaction.

4.      The terms of the Proposed Transaction are grossly unfair to Harbin's pubic shareholders. This unfairness is compounded by the fact that Defendant Yang stands on both sides of the Proposed Transaction and is attempting to take advantage of his dual roles as seller and buyer to purchase Harbin at an inadequate price.

5.      In proposing the Proposed Transaction, Defendant has breached his fiduciary duties to the Harbin public shareholders. As a result, Plaintiff and the Class members will be harmed.

## PARTIES

6.      Plaintiff Gerald G. Gould has been the beneficial owner of the Company's common stock at all relevant times and continues to be the beneficial owner of such shares.

7.      Defendant Tianfu Yang has served as Chairman of the Board of Directors and Chief Executive Officer of the Company since January 24, 2005. Defendant Yang owns 31.1% of the Company's common stock. The Company is a Nevada corporation

with its headquarters located at NO. 9 Ha Ping Xi Lu, Lu Ji Zhong Qu, Harbin Kai Fa

Qu, Harbin, People's Republic of China 150060.

8.    Defendant, as an officer and/or director of the Company, and/or

substantial shareholders of the Company, stand in a fiduciary relationship to Plaintiff and

the other public shareholders of the Company and owe them the highest fiduciary

obligations of due care, good faith, fair dealing, and full and candid disclosure.

## JURISDICTION AND VENUE

9.    The damages suffered and sought to be recovered by Plaintiff, are in

excess of the jurisdictional minimum of this Court.  The exact amount of damages

suffered by the Plaintiff cannot be precisely determined without access to Defendant's

records.

10.    This Court has jurisdiction because Defendant has sufficient minimum

contacts with New York to render the exercise of jurisdiction by the New York courts

permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this Court because the Company's United States offices

are located at 20 Ramblewood Road, Shoreham, NY 11786.

## DEFENDANT YANG'S FIDUCIARY DUTIES

12.    By reason of Defendant's position with the Company as Chief Executive

Officer ("CEO"), Chairman of the Board of Directors and controlling shareholder, he is

in a fiduciary relationship with Plaintiff and the other public shareholders of Harbin and

owe them, as well as the Company, a duty of due care, good faith, fair dealing, loyalty

and full, candid and adequate disclosure, as well as a duty to maximize shareholder value.

13.     Where the officers and/or directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; (ii) a break up of the corporation's assets; or (iii) sale of the corporation, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium. To diligently comply with his fiduciary duties, Defendant may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     favors himself or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits him from complying with his fiduciary duties;

(d)     will otherwise adversely affect his duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

14.     In accordance with his duties of loyalty and good faith, Defendant is obligated to refrain from:

(a) participating in any transaction where the Defendant's loyalties are divided;

(b) participating in any transaction where the Director or officer receives,

or is entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c) unjustly enriching himself at the expense or to the detriment of the public shareholders, or permitting other officers or directors to do so;

(d) structuring a sales process for the Company to favor directors, officers and/or other Company's insiders for reasons unrelated to the director's duty to seek the best price available for the Company's shareholders;

(e) engaging in any conduct in the context of a sales process for the Company that favors one bidder for the Company over another in derogation of the director's duty to seek the best price available for the Company's shareholders; and

(f)   failing to disclose and/or misrepresenting material information about the Company, the sales process for the Company and the Company's financial prospects going forward when seeking shareholder support of a merger transaction.

15.   Plaintiff alleges herein that Defendant, in connection with the Proposed Transaction is knowingly or recklessly violating his fiduciary duties, including his duties of loyalty and good faith owed to Plaintiff and other public shareholders of Harbin, insofar as Defendant stands on both sides of the transaction and is engaging in self-dealing and obtaining for himself personal benefits, including personal financial benefits, not shared equally by Plaintiffs or the Class, and has failed and is failing to provide shareholders with all material information concerning the Proposed Transaction.

16.   By virtue of his position as director and/or officer of Harbin and/or his exercise of control and ownership over the business and corporate affairs of Harbin, Defendant has, at all relevant times, the power to control and influence and cause Harbin

to engage in the practices complained of herein. Defendant herein is sued individually in his capacity as a director of Harbin. The liability of Defendant arises from the fact that he has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained herein.

17.     Because Defendant is breaching and has breached his duties of loyalty and good faith in connection with the Proposed Transaction, and because he stands on both sides of the transactions, Defendant bears the burden of proving the inherent or entire fairness of the Proposed Transaction, including all aspects of its negotiation and structure, price and process, as a matter of law.

<u>CLASS ACTION ALLEGATIONS</u>

18.     Plaintiff brings this action on its own behalf and as a class action on behalf of all shareholders of Harbin common stock and their successors in interest (except Defendant and any person, firm, trust, corporation, or other entity related to or affiliated with Defendant), who are or will be threatened with injury arising from Defendant's actions, as more fully described herein (the "Class").

19.     This action is properly maintainable as a class action.

20.     The Class is so numerous that joinder of all members is impracticable. According to the Company's SEC filings, as of August 6, 2010, the Company had 31,067,471 shares of common stock outstanding.

21.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

        i.   Whether Defendant has breached any of his fiduciary duty to
           Plaintiff and the Class in connection with the Proposed

Transaction, including the duty of good faith, diligence, and fair dealing;

ii.   Is Defendant, in connection with the Proposed Transaction, pursuing a course of conduct that does not maximize Harbin's value in violation of his fiduciary duties;

iii.   Whether Defendant is engaging self-dealing in connection with the Proposed Transaction;

iv.   Whether Defendant will unjustly enrich himself;

v.   Whether Defendant, in bad faith and for improper motives, has impeded or erected barriers to discourage other offers for the Company or its assets;

vi.   Whether Plaintiff and the Class would suffer irreparable damages and are entitled to injunctive relief as a result of Defendant's wrongful conduct.

22.   Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class.

23.   Plaintiff is an adequate representative of the Class, is committed to prosecuting this action, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

24.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

25.   Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

26.    Defendant has acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### *Company Background and Its Poise for Growth*

27.    Harbin designs, develops, engineers, manufactures, sells and services a wide array of electric motors including linear motors, specialty micro-motors, and industrial rotary motors, with focus on innovation, creativity, and value-added products. Products are sold in China and to certain international markets.

28.    Harbin's products are purchased by a broad range of customers including those customers in the energy industry, factory automation, food processing, packaging industry, power generation systems, mass transportation and freight transportation systems, chemical, petrochemical, metallurgical, mining, textile, agricultural, and machinery industries.

29.    Although affected by the global financial crisis like most other companies, according to the Company's August 6, 2010 SEC 10-Q filing, the second quarter of 2010, total revenues were $105.44 million, up 175% compared to $38.36 million in the second quarter of 2009. The significant sales growth was mainly the result of higher sales across all product lines and a contribution of $44.57 million from Xi'an Tech Full Simo, which was acquired in October 2009. Excluding the acquisition, organic growth was 59% year over year. International sales totaled $5.60 million, or 5.3% of total sales, for the quarter,

an increase of 56% compared with $3.58 million in the second quarter of 2009, when the

global economic downturn hit our international business severely.

*The Proposed Transaction Was Reached Through an Unfair Process for Harbin*
*Shareholders*

30.    On October 11, 2010, before the market open, the Company announced,

pertinent part, the following:

> its Board of Directors has received a proposal letter from its Chairman and Chief
> Executive Officer, Mr. Tianfu Yang ("Mr. Yang") and Baring Private Equity Asia
> Group Limited ("Baring") for Mr. Yang and an investment fund advised by
> Baring (the "Baring Fund") to acquire all of the outstanding shares of Common
> Stock of Harbin not currently owned by Mr. Yang and his affiliates in a going
> private transaction for $24.00 per share in cash, subject to certain conditions. Mr.
> Yang owns 31.1% of Harbin's Common Stock. According to the proposal letter,
> an acquisition vehicle for the purpose of completing the acquisition will be
> formed and the acquisition is intended to be financed with a combination of debt
> and equity capital. The proposal letter states that the equity portion of the
> financing would be provided by Mr. Yang, the Baring Fund and related sources.
> The proposal letter also states that Goldman Sachs (Asia) LLC ("Goldman") is
> acting as financial advisor to the acquisition vehicle to be formed by Mr. Yang
> and the Baring Fund.

31.    Prior to the announcement, the Company's common stock closed at $19.96

per share on October 8, 2010.  The proposed purchase price of $24.00 per share

represents only a 20% premium over the Company's prior closing price, at a substantial

discount to analyst target prices, at least one of which has been reported by Yahoo!

Finance as $33.00 per share.

32.    The proposed purchase price is unfair and inadequate consideration

because, among other things, the intrinsic value of the Company's stock is materially in

excess of the price per share that Defendant Yang is offering, giving due consideration to

the Company's prospects for growth and profitability in light of its business, earnings'

power, present and future. For example, revenue more than doubled in the second quarter on sharply improving demand and net income also increased significantly.

33.     Despite the increasing value of the Company's performance and the potential for even greater growth, Defendant has proposed the Proposed Transaction, which offers an inadequate and unfair price.

*Defendant Yang's Dual Role as Seller and Buyer*

34.     Given Defendant Yang's ownership of 31.1% of the Company and his position as Chief Executive Officer (C.E.O.) and Chairman of the Board of Directors of the Company, he inherently possesses a considerable amount of control over the Company's decisions.

35.     By virtue of his control of Harbin as a controlling shareholder, Defendant Yang must establish the Proposed Transaction's entire fairness, including fair price and fair dealing, in proceeding with the self-dealing acquisition of Harbin at the expense of the public shareholders. As such, the burden of proving the entire fairness of the Proposed Transaction, including all aspects of its negotiations, structure, price and terms is placed upon Defendant as a matter of law.

36.     Further, due to Defendant Yang's dual role as C.E.O/Chairman of the Board and one of the buyers, he has interests in the transaction disparate to those of the Company shareholders such that he cannot adequately and impartially represent the interests of the Company shareholders with regard to the Proposed Transaction. Moreover, due to his dominating equity position and roles as CEO and Chairman, Yang dominates and controls the entire Board of Directors, each member of which is beholden to him and serves on the Board at his pleasure.

37.     Due to Defendant Yang's involvement, this Proposed Transaction abounds with conflicts of interest. The C.E.O./Chairman of a company is legally obligated to guard shareholders' interests, which in the context of a sale means getting the highest price possible. This same individual, however, is also trying to buy the Company, and logically want to pay the lowest price possible.

38.     Indeed, studies show that mergers where the purchasers are insiders of the target company provide substantially less consideration to the target company's shareholders. An August 28, 2008 article in the *New Yorker* highlights the inherent conflict that arises upon the sale of a publicly traded company to insiders. As it noted:

> Since the beginning of 2005, nearly a hundred top-level executives at public companies have participated in management buyouts, or M.B.O.s, joining private- equity investors to buy their companies from shareholders.
>
> * * * * *
>
> The executives behind these buyouts say that they're the best solution for everyone involved. Investors get a nice bump in the price of their shares- H.C.A. shareholders, for instance, are getting twenty percent more than the market price- and executive are free from the demands of cautious investors and zealous regulators.
>
> * * * * *
>
> *What the executives in these deals don't say is that such buyouts create huge conflicts of interest.* The C.E.O. of a public company is legally obligated to look after shareholders' interests, which in the case of selling the company means getting the highest price possible. But when that same C.E.O. is trying to buy the company, he wants to pay the lowers price possible. Companies try to get around this by having independent members of the board of directors negotiate the deal. In practice, however, directors have generally been appointed by the company's C.E.O. and have spent a good deal of time working with him; they're hardly likely to drive a hard bargain. When the consortium led by Aramark's C.E.O. first bid for the company, for instance, it offered thirty-two dollars a share. After shareholders complained, it upped the bid by $1.80, which directors accepted. Now, that's some real haggling. *A study of buyouts over the*

*past two years suggests that when management is the buyer it pays, on average, thirty percent*
*less than an outside bidder.*

Even more troubling, management buyouts give executives at public companies an incentive not to maximize the value of their companies before the sale. In 1987, for instance, after the textile giant Burlington Industries was taken private by a buyout group that included top Burlington executives, it quickly sold off the company's "nonproductive assets," including ten separate divisions and a host of manufacturing plants, for well over half a billion dollars. The executives could have done those deals while Burlington was a public company. But doing them after the buyout, when they owned more of the firm, meant that they reaped more of the benefits. Similarly, management buyouts are often associated with major restructurings to make companies leaner and more profitable. With few exceptions, these restructurings could be done before buyouts. But they're not, in part because executives would rather wait until they own a bigger chunk of the company. A study of buyouts in the U.K., for instance, found that C.E.O.s who planned to buy their own companies were less likely to embark on restructuring than C.E.O.s who weren't.

*Also, executives, before making a buyout offer, use accounting gimmicks to make their company's performance look worse than it really is.* In a study of more than sixty companies that went private, Sharon Katz, of the Harvard Business School, found that, in the two years preceding a management buyout, companies recorded lower than expected accounts receivable, which drove profits down. Similarly, a study by tow accounting professors found that executives pursuing M.B.O.s tended to accelerate the recognition of revenue, making their companies' performance. But these studies suggest that part of the reason is that executives were making them look bad while they were public.

＊ ＊ ＊ ＊ ＊

But if management buyouts were really about the virtues of private ownership you'd expect companies that go private to stay private. The reality, though, is that, with high-profile deals, this rarely happens. Instead, after a company has been buffed and shines, it's generally taken public again. Both H.C.A. and Aramark, in fact, have gone from public to private to public, and now are private again. This suggests that management buyouts are often simply an opportunity for insiders to pick up assets on the cheap and flip them a few years later for fantastic sums. Over the past fifteen years, public companies have come up with ever more lavish performance-related pay packages, in the hopes of giving C.E.O.'s enough incentive to do their jobs and look after shareholders' interests. But why expect someone to be happy with tens of millions of

> dollars for putting shareholders first when he can get hundreds of millions
> for putting them last?
> (emphasis added)

39.   Further, as *The Wall Street Journal* reported on September 8, 2006, the

process through which a Company is sold to insiders is generally skewed in favor of the

Company's management. The Wall Street Journal article highlights this conflict as

follows:

> In such cases [where a company is being sold to management],
> management, with all its detailed knowledge of the company, goes from
> being a seller striving for a high price to being a buyer looking for an
> attractive price. Usually the sale of a public company involves an auction
> or a competitive-bidding process.  But when management [is involved],
> there often isn't such an open procedure, and the process is especially
> fraught with potential conflicts of interest.
>
> * * * * * * * * * *
>
> While some boards are diligent in vetting deals, the process sometimes is
> skewed in favor of a sale.  For example, there usually is a period when
> other bidders can come forth with offers. But if that window is short, the
> likelihood of a rival bid emerging isn't large, since potential buyers won't
> have time to perform due diligence. Special committees charged with
> weighing deals also can set breakup fees that make rival bidders pay
> dearly to get rid of the original buyer.
> (emphasis added).

40.   The terms of the Proposed Transaction are grossly unfair to the Harbin's

public shareholders.  This unfairness is compounded by the gross disparity between the

knowledge and information possessed by Defendant Yang by virtue of its position of

control of the Company and that possessed by the Company's public shareholders

41.   Plaintiff and the other members of the Class will suffer irreparable injury

unless Defendant is enjoined from breaching his fiduciary duties to the Company's public

shareholders in a proposed transaction which will benefit the Defendant Yang at the

expense of the Company's public shareholders.

42.   By reason of the foregoing, Plaintiff and each member of the Class is suffering irreparable injury and damages.

43.   Plaintiff and other members of the class have no adequate remedy at law.

## CLAIM FOR RELIEF

## COUNT I

## BREACH OF FIDUCIARY DUTY

### (Against Defendant Yang)

44.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

45.   As CEO, Chairman of the Board of Directors and controlling shareholder, Defendant Yang stands in a fiduciary relationship to Plaintiff and the other public shareholders of the Company and owes them the highest fiduciary obligations of loyalty and care. The Proposed Transaction will result in a change of control of the Company which imposes heightened fiduciary responsibilities to maximize Harbin's value for the benefit of the shareholders and requires enhanced scrutiny by the Court.

46.   As discussed herein, Defendant Yang has breached his fiduciary duties to Harbin shareholders by failing to engage in an honest and fair sale process, and bear the burden of demonstrating the entire fairness of the process and price of the Proposed Transaction.

47.   As a result of Defendant Yang's breach of his fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Harbin's assets and will be prevented from benefiting from a value-maximizing transaction.

48.     Unless enjoined by this Court, Defendant Yang will continue to breach his fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

49.     Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant jointly and severally, as follows:

(A)     Determining that this action is a proper class action and that Plaintiff is a proper Class representative;

(B)     Declaring that Defendant Yang has breached his fiduciary duties to the Plaintiff and the Class;

(C)     Enjoining, preliminarily and permanently, Defendant Yang and all persons acting in concert with him from consummating the Proposed Transaction, unless and until Harbin adopts and implements a fair transaction that does not irreparably harm Harbin's shareholders;

(D)     Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts

(E)     In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(F)    Directing that Defendant account to Plaintiff and the other members of the Class for all damages caused by him and account for all profits and any special benefits obtained as a result of his breaches of his fiduciary duties;

(G)    Granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: October 25, 2010          Respectfully submitted,

David A.P. Brower
**BROWER PIVEN**
 A Professional Corporation
488 Madison Avenue
Eighth Floor .
New York, NY 10022
Tel: 212-501-9000
Fax: 212-501-9000

*Counsel for Plaintiffs*

OF COUNSEL:

**FINKELSTEIN THOMPSON LLP**
Donald J. Enright
Elizabeth K. Tripodi
Rosalee B. Connell
1050 30th Street, NW
Washington, D.C. 20007
Tel.: (202) 337-8000
Fax: (202) 337-8090

*Counsel for Plaintiff*